EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JOSÉ A. TORO ROSAS, acusado y apelante.

*Número:* CR-63-17 *Resuelto:* 3 de octubre de 1963

*Mario Báez García,* abogado del apelante; *J. B. Fernández Badillo, Procurador General,* y *Nilita Vientós Gastón, Procurador General Auxiliar,* abogados de El Pueblo.

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

EL JUEZ ASOCIADO SEÑOR BELAVAL emitió la opinión del Tribunal.

El delito que se le imputa al señor Toro Rosas en este caso es haber conducido bajo los efectos de bebidas embriagantes, por una vía pública, un vehículo de motor. Hubo una colisión

entre dicho vehículo y otro, propiedad del testigo de la acusación Lupercio Mercado Soto. Este testigo declara, que al darle respiración artificial al acusado, echándole aire con su boca a la boca del acusado, de la boca de este último "salía peste a bebidas alcohólicas". El doctor Benjamín Westphal dice que al tomarle la muestra al acusado percibió en él "un aliento sospechoso, quizás de haber tomado algo . . ." "tenía un poco de aliento. No puedo decir que fuera de alcohol . . ." "Un aliento sospechoso de alguna bebida alcohólica". El doctor Westphal declara, que a pesar de tener el acusado veinticinco quemaduras de tercer grado, "estaba en conocimiento, pero decir conocimiento perfecto de todo lo que hacía no" . . . "no estaba en total conocimiento" que se le podían atribuir a "un estado de *shock* debido a las lesiones y la *posibilidad* de bebidas alcohólicas". Hablando sobre la condición mental del acusado, si estaba o no inconsciente, declaró: "En cierto sentido yo creo que estaba ciento por ciento; él sabía el nombre, donde vivía, sabía los nombres de su familia y conocía la gente; pero para responder a otras preguntas sobre otras cosas creo que no estaba completamente, aunque no se puede dar un porcentaje . . . pero yo creo que se puede poner que estaría como ochenta por ciento consciente". En cuanto al aliento el doctor declaró: "Bueno, en mi opinión el aliento era que había tomado algo de alcohol. Algo. No sé la cantidad que había tomado . . . yo no creo que pueda llegar a la conclusión de que está borracho a base del aliento."

La muestra de sangre que se obtuvo con el consentimiento del acusado, arrojó un resultado de 0.13 por ciento de alcohol, por peso. En la tramitación de este examen de sangre no se siguen las instrucciones del Reglamento promulgado para su identificación envío y cotejo. Después de tomarse la muestra, los tres frascos se le entregan a la Policía en vez de remitirse directamente por el médico que la tomó o el director o ejecutivo del hospital estadual, municipal o centro de salud. Si bien es cierto que el policía presente declara le entregó un frasco

al acusado, no especifica la prueba el momento preciso de la entrega ni la persona que lo recibiera por el acusado. El parte de remisión no aparece firmado por el acusado ni entregado a éste la tercera copia del parte de remisión según lo exige la Sec. 1043–5 del Reglamento relacionado con las "muestras de sangre y orina y otros procedimientos afines al análisis químico"—9 R.&R.P.R. sec. 1043–5. Lo que aparece de la transcripción de la prueba- (T.E. págs. 42–47) es bastante elocuente:

"P. ¿Y usted dice aquí que le entregó una muestra al acusado y dos muestras al doctor Westphal?

R. Le entregué una y las otras dos al doctor y se negó a cogerlas y dijo que eso era asunto del Departamento de la Policía.

P. ¿Entonces si el doctor Westphal hubiese declarado que se las entregó a usted estaría diciendo una falsedad?

HON. FISCAL: El testigo dijo que le entregó una muestra al acusado y que las otras dos se las entregó al doctor y no las quiso. Eso quiere decir que tenía las tres.

HON. JUEZ:

P. ¿El doctor no le entregó las tres?

R. Me entregó dos y yo le entregue una a éste.

P. ¿Y la otra dónde está?

R. No sé qué la haría él. .

LCDO. BÁEZ GARCÍA:

P. ¿Cuántas muestras le. entregó al doctor Westphal?

R. Yo, dos solamente. No las quiso. Dijo que eso era asunto del Departamento de la Policía.

P. ¿Cómo llegaron esas muestras a poder de usted?

R. El me las entregó.

P. ¿Cuántas muestras le entregó?

R. Me entregó tres y yo le dí una a éste.

P. ¿Cuando usted le entregó esa muestra al acusado usted le cogió la firma al acusado?

R. El estaba incapacitado porque estaba quemado.

P. ¿El hablaba?

R. Sí. hablaba y entendía perfectamente, tenía conocimiento.

P. ¿Se quejaba de dolor?

R. Se quejaba y decía que tenía frío.

P. ¿Usted no le cogió la firma por la incapacidad?

R. No se la pude coger.

P. ¿Por qué?

R. ¡Si él estaba postrado y tenía los brazos quemados, cómo iba a poder firmar!

P. ¿Pero la muestra la cogió él?

R. Yo me imagino . . . si no podía firmar, yo me imagino.

P. ¿Físicamente la cogió?

R. Físicamente no. Yo le dije: Aquí está la muestra. Entonces él dijo 'Póngala ahí' y yo la puse.

P. ¿Quién firmó la entrega?

R. El doctor Westphal firmó la de él, el papel que tenía que darle.

P. ¿Usted había intervenido en la toma de muchas muestras de sangre?

R. No. Era esa la primera vez.

P. ¿Qué hizo con la muestra que el doctor no quiso recibir?

Hon. Fiscal: Perdone el Tribunal.

El compañero está hablando en singular; está hablando en singular.

Lcdo. Báez García: Con las muestras.

Testigo: Como yo era el responsable de esas muestras, ya que él se negó a cogerlas, se las llevé al teniente Alameda y él las envió inmediatamente al Departamento de Salud.

Lcdo. Báez García:

P. ¿Cómo las envió?

R. En el mismo envase le puso el nombre y la selló con un tape.

P. ¿Por correo?

R. Sí, señor.

P. ¿Inmediatamente?

R. Sí, señor.

P. ¿Recuerda la hora que se tomaron las muestras?

R. Sí, le dije que eran de nueve y media a diez.

P. ¿Entonces ese mismo día salieron para San Juan?

R. Tan pronto yo llegué al cuartel le puso la dirección y las envió inmediatamente.

P. ¿Pero cómo sabía que las había enviado inmediatamente si eso no fue en presencia de usted?

R. Las llevé yo personalmente.

P. ¿A qué sitio las llevó?

R. Al correo de Hormigueros.

P. ¿A quien se las entregó?

R. Yo las eché por el aparato ese para echar los paquetes.

P. ¿Estaba abierto al correo?

R. El buzón que ponen cuando van a depositar cartas de noche. Igual que hay en Mayagüez.

P. Haga memoria, porque puede ser que esté confundido. ¿Usted está seguro de que eso fue tal como usted dice?

R. Sí, señor.

P. ¿Y a qué hora puso esas muestras en el buzón?

R. Bueno, llegaría allí como a las once o de once y media a doce."

Casualmente, es la irregularidad en esta tramitación, la que obliga a la ilustrada Sala sentenciadora a no admitir como prueba el parte de remisión. Véase *Pueblo* v. *Ramos Rojas*, Sentencia de 4 de junio de 1963.

 Es indudable que la correcta identificación de las muestras de sangre u orina, es una de las garantías del acusado en un procedimiento de esta naturaleza. La entrega de la muestra al acusado, y en caso de estar éste imposibilitado, a un familiar o amigo que pueda ocuparse de las diligencias de la comprobación, y la entrega al acusado de una copia del parte de remisión debidamente firmada por la persona que tomó la muestra y por el propio acusado, forman parte de una razonable oportunidad de defensa dentro de un nuevo método de prueba preparada casi exclusivamente en las agencias relacionadas con el Ministerio Fiscal. En este caso, todavía hay una circunstancia más, en cuanto a la identificación de las muestras, que merece consideración. En el momento de declarar sobre el contenido del análisis, el perito químico del Ministerio Fiscal se refiere a la muestra número 00300. Sin embargo, el doctor Westphal, la persona que toma la muestra se refiere a la muestra número 305-691. Es posible que el error en la enumeración provenga de una distinta numeración en ambas agencias, pero de ser esto así, dicha circunstancia debe hacerse constar claramente en la prueba.

■ Descartada la prueba pericial, por las irregularidades antes anotadas, aunque resulte el análisis favorable al acusado puesto que es menor de 0.15 por ciento de alcohol por peso que es el que determina la presunción de embriaguez, el caso queda reducido a los signos externos de dicha embriaguez. La única inculpación es la que se desprende del olor a bebida alcohólica, presentada en sus dos aspectos más extremos: "peste" y "aliento sospechoso" dentro de la propia prueba de inculpación. El análisis químico corrobora la segunda versión mejor que la primera. Recientemente hemos rechazado la suficiencia del aliento alcohólico, por sí solo, para establecer la inculpación: *Pueblo* v. *Zalduondo Fontánez*, 89 D.P.R. 64 (1963), cita precisa a la pág. 67. La incoherencia en el hablar la atribuye el perito médico del Ministerio Fiscal tanto a la obnubilación (*shock*) como a la posibilidad de haber ingerido alguna bebida alcohólica.

■ Este es el caso típico que crea esa insatisfacción de la conciencia que conocemos como duda razonable.

*Debe revocarse la sentencia apelada y declarar inocente al acusado.*