Colón Birriel, Juez Ponente
*1194 TEXTO COMPLETO DE LA SENTENCIA
I
El apelante Misael Peralta Burgos ("Peralta Burgos") fue juzgado por tribunal de derecho los días 22 y 23 de octubre de 1996, en el Tribunal de Primera Instancia, Sala Superior de Humacao. El Estado lo acusó por infracción al Art. 103 del Código Penal, 33 L.P.R.A. sec. 4065 (sodomía), infracciones a los Arts. 105 y 171 de dicho código, 33 L.P.R.A. sees. 4067 y 4277, respectivamente (actos lascivos impúdicos y escalamiento agravado) e infracción al Art. 4 de la Ley de Armas, 25 L.P.R.A. see. 414, por hechos ocurridos el 12 de enero de 1996 a eso de las 8:30 p.m. en la residencia de la perjudicada, Violeta Padilla Piñero, localizada en las parcelas Sector Común del Barrio Florida del Municipio de Naguabo. El foro de instancia lo declaró no culpable del delito de actos impúdicos o lascivos y culpable de los restantes delitos. Se refirieron los casos a las Oficinas de los Oficiales Probatorios para investigación e informe pre-sentencia, señalándose el pronunciamiento de la sentencia para el 5 de diciembre de 1996.
El 3 de diciembre de 1996, es decir, dos (2) días antes del pronunciamiento de la sentencia, Peralta Burgos presentó "Moción de Reconsideración de Fallo" alegando que "el Estado no había probado su culpabilidad por existir duda razonable acerca de ésta por lo que procedía su absolución". El pronunciamiento de la sentencia fue suspendido para el 19 de diciembre por no estar preparado el informe pre-sentencia solicitado, concediéndosele cinco (5) días al Ministerio Público para replicar a dicha moción, quien el 17 de diciembre presentó "Replica a Moción de Reconsideración de Fallo". 
Así las cosas, el 19 de diciembre de 1996, el foro de instancia sentenció a Peralta Burgos a una pena de reclusión de veinte (20) años en el caso de sodomía, a dieciocho (18) años en el caso de escalamiento agravado y de seis (6) meses por la infracción a la Ley de Armas, condenas a ser cumplidas consecutivamente entre sí, ordenándose su ingreso a una institución penal.
El 19 de marzo de 1997, Peralta Burgos solicitó la reconsideración de la sentencia a lo que se opuso el Ministerio Público. El 10 de abril de 1997, el foro de instancia dictó orden, la que se transcribe a continuación:

"EL PRESENTE CASO ESTA ANTE CONSIDERACION DEL TRIBUNAL APELATIVO, POR LO QUE EL TRIBUNAL ACOGE LAS MOCIONES Y LAS DEJA PENDIENTE DE RESOLVER."

A pesar de que el foro de instancia carecía de jurisdicción para entender en las mociones presentadas, no obstante, tampoco la tenía a tenor con las disposiciones de la Regla 196 de Procedimiento Criminal, según enmendada, 34 L.P.R.A. Ap. II, R. 196. La regla dispone que la reconsideración a la sentencia debe solicitarse dentro del término improrrogable de quince (15) días desde que fue dictada. En este caso la sentencia fue dictada el 19 de diciembre de 1996 y la reconsideración se presentó el 19 de marzo de 1997, es decir, ochenta y cinco (85) días en exceso del término dispuesto en la Regla 196, supra, por lo que el foro de instancia no tenía jurisdicción para resolverla. En adición tampoco la tenía por estar el caso en apelación.
Confirmamos.
II
La prueba de cargo, creída por el juzgador consistió de evidencia documental y de los testimonios de la perjudicada Sra. Violeta Padilla Piñero, del Sr. Miguel A. Suárez Rosario, y del Dr. Edgard Richardson Pérez. Por su parte, Peralta Burgos presentó como testigos al Sr. Juan Carlos Padilla, hermano de la perjudicada, quien aparecía como testigo de cargo y no fue utilizado por el Ministerio Público y al Sr. Rubén Rodríguez Maldonado, como testigo de reputación. De la Exposición Narrativa de la Prueba (Enmendada) E.N.P., aprobada por el foro de instancia surge, en lo pertinente, lo siguiente:

"A- Prueba del Ministerio Público

*1195
1 - Testimonio de Violeta Padilla Piñero

Declaró que se desempeña como ama de casa, tiene veintiséis (26) años de edad y vive en una parcela en el Sector Común del Barrio Florida de Naguabo, con su compañero Miguel Angel Suárez, su hermano Juan Carlos Padilla y sus hijos de siete (7), cinco (5) y tres (3) años de edad. El día de los hechos, 12 de enero de 1996, se encontraba en su residencia con su hermano, su compañero y sus hijos, cuando alrededor de las 7:30 p.m., su compañero y su hermano se fueron a echarle gasolina a su automóvil al pueblo de Naguabo. Posteriormente, acostó a sus hijos, se bañó y se puso la ropa. Regresó al baño a peinarse y cuando va a entrar al baño sintió que una persona la tomó por la espalda, le agarró el cabello y la haló hacia atrás, agarrándola por la cintura y le preguntó que si era Violeta, ella hizo un gesto afirmativo con la cabeza. En esos momentos, es decir, cuando está ocurriendo lo anterior, ve al acusado (en adelante Peralta Burgos a quien señaló en sala), salir del baño con un cuchillo en la mano poniéndoselo en el cuello y le dijo que si gritaba le picoteaba los nenes. Se mantuvo callada, no se movió ni gritó mientras la persona que estaba detrás de ella, a quien ella no pudo ver, le dice "la venganza es dulce". Luego la introducen en el baño y la arrodillan. El que estaba detrás de ella la soltó y Peralta Burgos, quien se encontraba al frente de ella, la agarró por el pelo, le inclinó la cabeza hacia atrás y le puso el cuchillo en el cuello. El que estaba detrás empezó a romperle la ropa, a rasgarle la espalda, el pecho, le rompió su ropa interior, pantalones, brassier y le sigue diciendo "la venganza es dulce". Cuando la persona que estaba detrás de ella le rompió la ropa, Peralta Burgos le indicó al otro individuo "por el frente", pero, éste le dice que por detrás para que se acuerde de ellos y le introdujo el pene sintiendo dolor. 

En el momento en que le introdujo el pene, escuchó el auto de su compañero. Peralta Burgos sólo la miraba y le agarraba el pelo hacia atrás con el cuchillo en el cuello. Su compañero empezó a tocar la puerta y la persona que estaba detrás de ella salió corriendo, la empujó y volvió a repetirle que la venganza era dulce. Peralta Burgos le reiteró que si decía algo le "picoteaba los nenes". Le tiró el cuchillo y salió corriendo. Se sintió asustada, tenía miedo por la vida de sus hijos, por lo que prefirió callar para protegerlos. Señaló que sintió cuando salieron las dos (2) personas de su casa que se cayó un cubo de comida de cerdo que estaba al lado de la puerta de la cocina y sintió la peste a comida. Escuchó que su compañero la seguía llamando a la puerta y sintió cuando uno de sus hijos se levantó y su compañero le dice "yo la oigo llorando, pero no sé donde está". Su compañero entró al baño y la observó con el cuchillo en la mano arrodillada en la bañera y le preguntó porqué tenía la ■ropa rota y le quitó el cuchillo. Ella se sentía sucia, "asquerosamente mal". Posteriormente, su hermano y su suegra entraron al baño, pero ella no se dejaba auxiliar de nadie. Abrió la pluma y comenzó a bañarse porque se sentía sucia y quería limpiarse. Su suegra la convenció y la llevó al cuarto. Mandó a buscar a su hermana y al ésta llegar, llegaron también los policías. Los policías le hacían las preguntas a su hermana, y su hermana le preguntaba y ella le contestaba. Fue atendida por un ginecólogo en el Hospital Regional de Humacao, ya que al llegar al Hospital de Naguabo no había uno disponible. 

Al llegar al hospital estaba llorando, le dolían las costillas, el pecho y se sentía abochornada. Manifestó, que la puerta de la cocina estaba abierta, que entrando por la cocina se encuentra el fregadero. Testificó que le introdujeron el pene por uno (1) a dos (2) minutos, sentía dolor, como si le desgarraran el ano. Quedó traumatizada y sangraba. El mismo día de los hechos la entrevistó el agente Emilio Rodríguez, a quien le dió una descripción de las personas. Conoció a Peralta Burgos porque es el cuñado de su hermana Damaris. La descripción que le dió originalmente al Agente Rodríguez fue por la amenaza a sus hijos. Semana y media o dos más tarde, cambió la descripción de las personas y señaló que uno de los atacantes era Peralta Burgos. Lo hizo porque tenía pesadillas, que Peralta Burgos pasaba por su casa y que no le había dado permiso a éste para entrar a su casa. Se admitieron varias fotografías y el cuchillo como evidencia. 

En el contrainterrogatorio declaró más o menos similar a lo declarado en el interrogatorio directo. Señaló que su compañero y su hermano salieron por la puerta del frente de la casa que ella cerró con seguro y que la única llave de la puerta la tenía ella. Acostó a sus tres (3) hijos mayores en el cuarto de ella. Señaló que el 3 de abril de 1996, y a preguntas del Ministerio Público, no había señalado que había gritado cuando Peralta Burgos salió del baño. Señaló que escuchó cuando su compañero le dijo al agente que se habían demorado porque estaban hablando con unos amigos. Cuando los atacantes se fueron de su casa, la testigo tenía el "pantie" y los pantalones bajados, el 
*1196
"sweater" puesto y el sostén roto, pero puesto. La metieron en la bañera y la ñangotaron, a veces con las manos en el piso y otras no. Su cabeza estaba hacía la ducha y su cuerpo en la bañera. Peralta Burgos estaba en la bañera pegado al lavamanos y la otra persona estaba detrás de ella, Peralta Burgos le tenía puesto el cuchillo en el cuello. Al momento de la penetración tenía las rodillas y las manos puestas en el piso. Desde que la otra persona le puso las manos por detrás hasta que se fueron pasaron de quince (15) a veinte (20) minutos. Conoce a Peralta Burgos, nunca había hablado con él. Su hermana Damaris está casada hace cuatro (4) años con Israel Peralta (hermano de Peralta Burgos) a quien conoce y quien visitaba su casa. Vio a Misael (Peralta Burgos) por primera vez hacía tres (3) años y desde esa vez hasta que ocurrieron los hechos lo vió dos o tres veces.

En su casa no le describió a la policía a las personas. Al llegar al Hospital de Humacao le dió una descripción de las personas que estaban en su casa. Cuando relató los hechos del caso, el agente Rodríguez, su compañero y su hermano estaban con ella en la sala. Su esposo y su hermano le preguntaron quiénes eran y les dijo que no sabía. Señaló que su compañero le dijo que el acusado le había dicho que él no era la persona que se había metido en su casa, esto sucedió antes de la testigo cambiar su versión. También escuchó a su hermano hablar sobre este asunto con su compañero. Cuando su compañero y su hermano llegaron al baño ella todavía tenía puestas las prendas de vestir. Luego ella se quitó la ropa y se bañó. Ella había dejado la puerta de la cocina abierta y pasó frente a ésta en tres ocasiones y no recuerda si estaba abierta luego de que se fue su compañero.

En el redirecto recalcó que no quiso gritar ni hacer nada por temor a que le hicieran algo a sus hijos. El cuchillo con el cual fue amenazada, lo había dejado encima del gabinete de la cocina. En el momento de la penetración tenía el pantalón bajado, y se lo había bajado la persona detrás de ella. 

2- Testimonio de Miguel A. Suárez Rosario
Es el compañero consensual de la víctima, Violeta Padilla Piñero. Declaró que tiene veinticuatro (24) años. La defensa hace planteamiento basado en la R. 81 de las de Evidencia solicitando una inspección ocular de la residencia donde ocurrieron los hechos. El juez acogió la solicitud para resolverla posteriormente. El testigo declaró conocer a la víctima desde hace dos (2) años y vive con ella en el Sector Común del Barrio Florida con su cuñado, los hijos de su compañera y su hijo Miguel Angel Suárez. El día de los hechos, salió con su cuñado alrededor de las 7:30 y regresó a la residencia entre 8:30 y 8:45 p.m. Al regresar tocó a la puerta y nadie contestó, tocó más fuerte y le abrió Julio Angel, él nene mayor. Al entrar no encontró a su compañera y se dirigió al baño y la encontró ñangotada (puesta en cuclillas), con el cuchillo en mano. Cuando se dirigía al baño oye llorar a su esposa, quien estaba nerviosa y traumatizada, tenía el cuchillo apuntándose al pecho y temblaba. Le quitó el cuchillo y lo puso encima del fregadero, ella no quería que la tocara. Forcejeó con ella y le quitó el cuchillo. Llamó a su mamá, quien ayudó a su compañera a cambiarse de ropa. Llamó también a la hermana de su compañera y al llegar los policías, la hermana le transmitía a éstos lo que decía la víctima. Continuó declarando que semanas después del incidente, Peralta Burgos lo mandó a parar para decirle que había unos rumores en el barrio de que él se había metido en su casa y de que él tenía un testigo que no había sido él. A raíz de esta conversación, le preguntó a su compañera si había sido él Peralta Burgos y ésta no le contestó y le pidió que fueran al cuartel y allí informó que uno de los atacantes había sido éste.

En el contrainterrogatorio, declaró en términos similares a lo declarado en el interrogatorio. Señaló que cuando salió de su casa dejó la puerta abierta. Conocía a Peralta Burgos desde pequeño, debido a que se criaron en el mismo barrio. Señaló que había observado a éste pasar por su casa en más de una ocasión. Tenía una copia de la llave de su casa en el llavero, pero la había dejado en el "switch" del automóvil. 

3- Testimonio del Dr. Edgard Richarson Pérez

Declaró desempeñarse como ginecólogo. El día de los hechos recibió a una paciente llamada Violeta Padilla Piñero en el área de ginecología del Hospital de Humacao alrededor de la 1:00 a.m., en la Sala de Emergencia la recibieron a las 11:32 p.m. Esta le informó que estaba en su casa y de 8:00 a 8:30 p.m., fue agarrada por detrás por dos (2) individuos y le informa como ocurrieron los 
*1197
hechos y le indicó que uno (1) de ellos tuvo penetración pero, no hubo eyaculación. Le informó que al llegar su compañero los atacantes la empujaron en el baño y recibió un trauma en la órbita del lado derecho del ojo. Al cuestionar sobre el historial, le indicó que su último coito voluntario había sido tres (3) días antes, que estaba esterilizada y padecía de epilepsia. No se había bañado, defecado u orinado luego de los hechos. 

En el examen general reflejó trauma encima del ojo y lesiones de rascado en la parte baja de la espalda. No tenía heridas sangrientas. En el examen anorectal encontró dos (2) laceraciones superficiales que no estaban sangrando. Estas laceraciones son como un rasguño de la mucosa, que es como la mucosa de la boca con un tejido bien frágil, y la raspadura es bien superficial. No había sangrado y sufría de hemorroides. Las laceraciones eran de menos de veinticuatro (24) horas.

En el contrainterrogatorio señaló que de haber una penetración anal no consentida, a la fuerza, se esperaría una laceración más profunda. La laceración depende de la fuerza utilizada en el acto y del tamaño de pene u objeto utilizado. Es importante saber si se bañó porque se podría utilizar evidencia para identificar al agresor, ya fuera vello púbico de la otra persona o sangre. La víctima le indicó que no se había bañado luego de los hechos, sí antes. De su examen consiguió vello púbico.

A preguntas del magistrado, el testigo contestó que los hallazgos encontrados en la víctima eran compatibles con una penetración de uno (1) a dos (2) minutos.

B- PRUEBA DE DEFENSA

1 - Testimonio de Juan Carlos Padilla

Figuraba como testigo del Ministerio Público, fue renunciado y puesto a la disposición de Peralta Burgos, quien lo utilizó. Señaló que el día de los hechos fue con su cuñado (Miguel A. Suárez) a echar gasolina de 7:00 p.m. a 7:30 p.m. El automóvil estaba estacionado en la parte trasera de la casa. Se dirigieron directamente al pueblo y de regreso se detuvieron en el puente a charlar con unas amistades. No pudo determinar el tiempo que estuvieron en el puente y que allí no había "bar". 

2- Testimonio de Rubén Rodríguez Maldonado

Declaró que se desempeña como Ingeniero Consultor en el campo de Sistema de Información. Trabaja por su propia cuenta, en su compañía que se llama "The Service Group". Reside con su esposa en Fajardo hace nueve (9) años. Pertenece a una serie de entidades cívicas. Conoce a Peralta Burgos hace dos (2) años, quien fue referido por la Dra. Susan Cabrera. Ha visitado la comunidad donde éste vive y las personas que allí ha conocido le han hablado de que es un muchacho bueno. Nadie lo conoce como una persona problemática.

Terminado el interrogatorio de este testigo, y con él la prueba de defensa, ésta reiteró su solicitud de que se realizare una inspección ocular del baño de la residencia, lugar de ocurrencia de los hechos. El tribunal procedió a examinar las fotografías del Pueblo marcadas como Exhibits l(c)(d) y (e) en las que se refleja el baño de la residencia donde ocurrieron los hechos. La defensa expresó "que las fotos no reflejan claramente el tamaño del baño y si el tribunal pudiera observar ese sitio en particular, podría tener mejor apreciación". El tribunal hizo constar que del examen de las fotografías se reflejaba que cabían dos (2) personas en el baño. Por su parte, el Ministerio Público expresó que a base de la prueba desfilada, la defensa tuvo oportunidad de explorar ese punto y no lo hizo, por lo que no procedía la inspección ocular. Luego de las argumentaciones, el tribunal denegó la inspección solicitada."

Con la prueba antes reseñada y como hemos expresado, creída por el foro de instancia, quedó sometido el asunto ante su consideración. Así las cosas, dicho foro, exoneró a Peralta Burgos del delito de actos lascivos o impúdicos y lo encontró culpable de sodomía, escalamiento agravado e infracción al Artículo 4 de la Ley de Armas. Fue sentenciado a las penas mencionadas anteriormente.
III
Inconforme con la sentencia, Peralta Burgos apela ante nosotros, imputándole al foro de instancia *1198 tres (3) errores:

"(1) declararlo culpable, no obstante, la prueba de cargo ser insuficiente para establecer su culpabilidad más allá de toda duda razonable; (2) denegarle la inspección ocular solicitada; e (3) imponerle sentencias con agravantes, lo que constituye un castigo cruel e inusitado."

En esencia, Peralta Burgos alega en su primer error que la prueba recibida por el foro de instancia es insuficiente para establecer su culpabilidad más allá de toda duda razonable. Veamos.
La Sección 11 del Art. II de nuestra Constitución garantiza el derecho de todo acusado "a gozar de la presunción de inocencia". Por otro lado, la Regla 110 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 109, dispone, en lo pertinente, que "[e]n todo proceso criminal, se presumirá inocente al acusado mientras no se probare lo contrario, y en caso de existir duda razonable sobre su culpabilidad, se le absolverá". Esto implica que el Ministerio Fiscal viene obligado a probar la culpabilidad del acusado más allá de duda razonable." Pueblo v. Ramos y Alvarez, 122 D.P.R. 287, 315-316 (1988); Pueblo v. Bigio Pastrana, 116 D.P.R. 748, 760-761 (1985); Pueblo v. Ortiz Morales, 86 D.P.R. 456 (1962). Tienen que establecerse todos los elementos del delito imputado. Pueblo v. Ramos y Alvarez, supra; Pueblo v. Bigio Pastrana, supra.
Es un principio fundamental de nuestro sistema de derecho y elemento del debido proceso de ley, que se establezca la culpabilidad de un acusado más allá de duda razonable. Pueblo v. Cruz Granados, 116 D.P.R. 3 (1984). Es obligación del Ministerio Público probar la culpabilidad del acusado mediante evidencia que establezca todos los elementos del delito más allá de duda razonable, Pueblo v. Pagán Santiago, _ D.P.R. _ (1992), 92 J.T.S. 56, Opinión de 20 de mayo de 1992. Para cumplir con este requisito se requiere que la prueba presentada por el Ministerio Público sea "suficiente en derecho", lo que significa que la evidencia presentada tiene que producir certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. Pueblo v. Rodríguez Román, _ D.P.R. _ (1991), 91 J.T.S. 26, a la pág. 8476; Pueblo v. Narvaez Narvaez, 122 D.P.R. 80, 86 (1988); Pueblo v. Carrasquillo, 102 D.P.R. 545, 552 (1974). La insatisfacción con la prueba es lo que se conoce como la duda razonable. Pueblo v. Somarriba García, _ D.P.R. _ (1992), 92 J.T.S. 109, a la pág. 9869; Pueblo v. Cabán Torres, 117 D.P.R. 645, 652 (1986). A esos efectos nuestro Tribunal Supremo ha establecido como principio de derecho que:
El Ministerio Fiscal no cumple con ese requisito presentando prueba que meramente sea "suficiente", esto es, que verse sobre todos los elementos del delito imputado; se requiere que la misma sea "suficiente en derecho". "Ello significa que la evidencia presentada además de suficiente, tiene que ser satisfactoria, es decir que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido...". Pueblo v. Carrasquillo, supra. Esa insatisfacción con la prueba es lo que se conoce como duda razonable y fundada. Pueblo v. Toro Rosas, 89 D.P.R. 169 (1963), supra; Pueblo v. Cabán Torres, 117 D.P.R. 645, a la pág. 652; Pueblo v. León Martínez, 93 J.T.S. 22, (1993).
El significado jurídico del precepto duda razonable se ha definido de la siguiente manera:
"...no quiere decir que toda duda posible tenga que ser destruida y que la culpabilidad del acusado tenga que establecerse con certeza matemática, sino que la evidencia establezca aquella certeza moral, que convence, dirige la inteligencia y satisface la razón. Duda razonable es una fundada, producto del raciocinio de todos los elementos de juicio envueltos en el caso". Pueblo v. Bigio Pastrana, 116 D.P.R. 748, 761 (1985). Véase además, Pueblo v. Meléndez Rodríguez, _ D.P.R. _ (1994), 94 J.T.S. 103; Pueblo v. Cruz Granados, supra.
La norma en esta jurisdicción es que, en ausencia de pasión, prejuicio, parcialidad o error manifiesto, un foro apelativo no ha de intervenir con la apreciación y adjudicación de credibilidad que con relación a la prueba de los hechos hubiese realizado el juzgador a nivel de instancia. Pueblo v. Meliá León, _ D.P.R. _, 97 J.T.S. 110, a la pág. 1356; Pueblo v. Rivera, _ D.P.R. _, 94 J.T.S. 150, a la pág. 510; Pueblo v. Pagán Santiago, _ D.P.R. _ (1992), 92 J.T.S. 56, a la pág. 9481; Pueblo v. Pellot Pérez, 121 D.P.R. 791, 806 (1988); Pueblo v. Pagán Díaz, 111 D.P.R. 608 (1981); Pueblo v. Cruz Negrón, 104 D.P.R. 881, 882, (1976). Corresponde, pues, al jurado o, en su defecto, al juez que *1199 presidió el proceso, dirimir los conflictos de pmeba.
Por otro lado, la apreciación que hace un juzgador de la evidencia desfilada durante un proceso judicial criminal es una cuestión mixta de hecho y de derecho. Es así, por cuanto el análisis que de la prueba presentada se realiza "pone en movimiento, además de la experiencia del juzgador, su conocimiento del derecho para así llegar a una solución justa de la controversia." Pueblo v. Carrasquillo, supra; Pueblo v. Cabán Torres, supra. La credibilidad consiste en una asignación valorativa de certeza o probabilidad sobre una versión de los hechos o acometimientos incidentales al caso.
En los casos ventilados ante jurado, es éste el que viene llamado "a ejercer este juicio valorativo sobre la totalidad de la prueba y para el mismo sólo se requiere valerse del sentido común, la lógica y la experiencia para deducir cuál de las versiones, si alguna, prevalece sobre las otras. Los criterios que guían la evaluación de la prueba en un juicio son idénticos a aquellos que utilizamos en la vida cotidiana, tales como el comportamiento y el carácter de quienes dan su versión de los hechos, la parcialidad que puedan afectarles, la naturaleza de la declaración y otros. Por tanto, el juicio sobre la credibilidad de la prueba prescinde de conocimientos previos o especializados en derecho". Pueblo v. Colón Burgos, _ D.P.R. _ (1996), 96 J.T.S, 52, a la pág. 970. En los casos ventilados por tribunal de derecho, como en el presente caso, el juez de instancia es el que está llamado a ejercer el juicio valorativo sobre la totalidad de la pmeba.
Es por ello que la determinación de si se ha satisfecho el quántum de prueba que exige la Constitución es una mixta de hecho y de derecho. De ahí que sea revisable en apelación por este Tribunal como una cuestión de derecho. Pueblo v. Echevarría Rodríguez, _ D.P.R. _ (1991), 91 J.T.S. 43, a la pág. 8567; Pueblo v. Bonilla Romero, 120 D.P.R. 92, 111 (1987); Pueblo v. Pagán Díaz, 111 D.P.R. 608 (1981); Pueblo v. Cabán Torres, supra, a la pág. 648.
Es norma reiterada en nuestra jurisdicción que un tribunal apelativo no intervendrá con la apreciación de la prueba realizada por el Tribunal de Instancia en ausencia de prejuicio, parcialidad o error manifiesto. Pueblo v. Ayala Cancel, 96 D.T.A. 80, pág. 197, (1996). No obstante, una apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de este Tribunal. Pueblo v. Rosa Ramírez, _ D.P.R. _ (1994), 94 J.T.S. 87, a la pág. 12,301; Vda. de Morales v. De Jesús Toro, 107 D.P.R. 826, 829 (1978).
A la luz de los anteriores principios es que hemos examinado los expedientes originales, la exposición narrativa de la pmeba y los escritos de las partes. Veamos.
La representación legal de Peralta Burgos alega en su recurso que hay dudas y contradicciones en la prueba presentada por el Estado. Consisten dichas contradicciones, a su juicio, en que la perjudicada testificó:

"1 - que al salir su compañero ella cerró con seguro la puerta principal de su residencia y no se dió cuenta, si la otra puerta la de la cocina estaba abierta, a pesar de haber pasado tres (3) veces frente a la misma (entendemos no es una contradicción);

2- que era la única que tenía llave de la puerta de entrada, ya que hacía dos (2) meses que vivía allí y no tenía copia de la llave mientras su compañero declaró que hacía seis meses que vivían allí y tenía una copia de la llave de la puerta en su llavero donde tenía las llaves del auto;

3- que al salir los atacantes escuchó que se cayó el cubo de la comida de cerdo, mientras que su compañero que estaba en la puerta del frente no escuchó nada (entendemos no es una contradicción);

4- que escuchó a su hijo decirle a su compañero que ella estaba llorando pero no sabía dónde estaba, mientras que su compañero declaró que estuvo tocando la puerta por dos (2) minutos, teniendo copia de la llave de la puerta, su hijo le abre la misma y no le hace expresión alguna (tampoco es una contradicción);

5- que había un niño en la sala durmiendo y los otros tres en el cuarto, mientras que su compañero 
*1200
declaró que cuando entró a la casa va a su cuarto donde encuentra al niño de año y medio durmiendo en su cama (tampoco es una contradicción);

6-que había estado llorando todo el tiempo, mientras su compañero señaló que sólo la escuchó llorar cuando fue a entrar al baño (puede que su compañero la haya escuchado llorar cuando va para el baño, y no saber sí ella lloró antes);

7-que cuando su compañero la encontró tenía los pantalones y los "panties" en los muslos, mientras que su compañero declara que cuando la ve en el baño tiene dicha ropa interior y los pantalones en la cintura (lo que realmente declaró, según la E.N.P.,fue que tenía sus prendas íntimas bajadas y que cuando entró al baño tenía toda la ropa rota encima);

8- que se había bañado, mientras que su compañero declaró que no lo hizo (lo que realmente éste declaró según la E.N.P., fue que no la vió bañándose, que es muy distinto a que no se bañó);

9- que había sangrado, mientras que el Dr. Richardson declaró no encontrar ningún sangrado en el ano. Se le olvida decir que los hallazgos encontrados por dicho galeno en su examen de la víctima eran compatibles con una penetración de uno a dos minutos como ella había testificado;

10- que le describió al agente investigador a la persona que estaba al frente de ella como de 5‘5” de estatura, tenía manchas claras en los brazos y de 18 a 23 años de edad, descripción que repite cerca del medio día del próximo día, descripción que no se ajusta a la de Peralta Burgos (se le olvida a la representación legal de Peralta Burgos decir, que esa descripción fue dada porque ella prefirió callar por temor a la amenaza que le hicieron de picotear a sus hijos si decía algo, olvida mencionar que ella cambió la descripción semana y media después cuando llamó al agente y señaló a Peralta Burgos como uno de los autores, a quien conocía anteriormente y a quien también conocía su compañero), y;

11- que es increíble su versión de que Peralta Burgos, a quien conocía, estuvo siempre al frente de ella, sin máscara, sin cubrirse y que el otro, a quien no conocía, nunca le dió la cara, ahí estriba la credibilidad de su testimonio."

Los síntomas de miedo y ansiedad, los que presentaba Doña Violeta, según los estudios, subsisten después de una violación, una sodomía, un acto lascivo o impúdico, o cualquier otro delito sexual, por lo cual no puede esperarse que sus víctimas produzcan una declaración completa y exacta a pocas horas de los hechos. Se recomienda demorar el interrogatorio completo hasta el otro día, cuando las ansiedades de la víctima hayan disminuido, lo que es más humano y productivo. Es de esperarse que las víctimas recuerden más a medida que disminuyen sus ansiedades. Pueblo v. Mattei Torres, 121 D.P.R. 600, 619 (1988).
Por otro lado, las contradicciones que puedan surgir en el testimonio de un testigo, no tienen el efecto de que la sentencia tenga que ser revocada, si el tribunal apelativo no quedare con insatisfacción o intranquilidad de conciencia de modo tal que estremezca su sentido básico de justicia. Pueblo v. Rivero Diodonet, 121 D.P.R. 454 (1988); Pueblo v. Martínez Meléndez, 123 D.P.R. 620 (1989). A pesar de que el caso que nos ocupa no es una violación, no obstante, cobran particular interés en la controversia las expresiones de nuestro más alto foro en Pueblo v. Mattei, supra; [e]n Com. de la Mujer v. Srio. de Justicia, 109 D.P.R. 715, 732-733 (1980), recogimos la visión de que en "procesos criminales contra acusados de violación, existe una tendencia a considerar a la perjudicada como una pieza más de evidencia. El rol de la víctima es establecer un caso legal contra el ofensor; las víctimas frecuentemente informan que sus encuentros con la Policía, fiscales y personal del tribunal fueron más traumáticos que el incidente de la violación. Judicial Attitudes Toward Rape Victims, 57 Judicature 303 (1974)". Hoy, diversos estudios científicos demuestran que desde sus inicios la mayoría de las víctimas experimentan no sólo el ataque a su integridad corporal, sino diversas lesiones severas, de carácter psicológico, que oscilan desde miedo, ansiedad, paranoia, depresión, confusión, sensibilidad interpersonal, autoestima y ajuste social. Se ha confirmado que estos efectos perduran más tiempo de lo que originalmente se pensaba.
Las alegadas contradicciones habidas en el testimonio de la perjudicada no son, a nuestro juicio, *1201 suficientes como para no darle crédito al testimonio de ésta. Su testimonio en relación a los hechos esenciales fue claro y preciso. Las alegadas contradicciones no versan sobre cuestiones sustanciales que puedan no configurar los delitos imputados. Estas en nada afectan la credibilidad del testimonio de la víctima para establecer los elementos constitutivos de los delitos imputados.
Por otro lado es norma reiterada en nuestra jurisdicción que un tribunal apelativo no intervendrá con la apreciación de la prueba realizada por el foro de instancia en ausencia de prejuicio, parcialidad o error manifiesto. Véanse, Pueblo v. Chévere Heredia, _ D.P.R. _ (1995), 95 J.T.S, 115, a la pág. 35; Pueblo v. Meléndez Rodríguez, _ D.P.R. _ (1994), 94 J.T.S. 104, a la pág. 14; Pueblo v. Bonilla Romero, 118 D.P.R. 92, 111 (1987).
En la presente situación, Peralta Burgos no ha demostrado la existencia de alguno de estos elementos en la apreciación de la prueba por parte del foro de instancia. La prueba presentada estableció su culpabilidad más allá de toda duda razonable, por lo que el primer error no fue cometido.
Pasemos al segundo señalamiento de error. Sostiene Peralta Burgos que erró el foro de instancia al negar una inspección ocular del área de la ducha del baño, lo que hubiere demostrado la imposibilidad de que allí cabían tres (3) personas. Veamos.
La Regla 81 de las de Evidencia dispone que "[l]a inspección ocular es un medio de prueba que el tribunal puede admitir de conformidad con lo dispuesto en los Artículos 1169, 1194 y 1195 del Código Civil y en la Regla 134 de Procedimiento Criminal. El tribunal puede denegar una inspección ocular a base de los factores señalados en la Regla 19". 32 L.P.R.A. Ap. IV, R. 81. La Regla 19, por su parte establece que "[e]videncia pertinente puede ser excluida cuando su valor probatorio es de poca significación en relación a cualesquiera de estos factores: (a) Peligro de causar perjuicio indebido (b) probabilidad de confusión (c) desorientación al jurado (d) dilación de los procedimientos, (e) innecesaria presentación de prueba acumulativa."
En Pueblo v. Pagán Díaz, 111 D.P.R. 608, 617 (1981), nuestro Tribunal Supremo, a su vez, establece que la inspección ocular, como medio de prueba, puede ser pertinente, pero su valor probatorio de poca significación en relación con los factores antes mencionados.
El Tribunal Supremo también ha dispuesto que la concesión de una inspección ocular del lugar de los hechos es discrecional del tribunal a tenor con la Regla 134 de Procedimiento Criminal, supra, Pueblo v. Burgos Hernández, 113 D.P.R. 834, 838 (1983).
No obstante, ”[e]l discernimiento judicial que debe preceder tal determinación exige la evaluación de dos (2) condiciones: (a) el tribunal debe constatar y velar porque el lugar a ser examinado se halle sustancialmente en las mismas condiciones que cuando se cometió el delito; y (b) debe medir la necesidad real, su pertinencia y el esfuerzo que ello conlleva". Pueblo v. Pagán Díaz, supra, a la pág. 617.
Por las razones anteriores, la regla general es que no abusa de su discreción el tribunal que deniega una inspección ocular que nada añadiría al proceso y, en cambio, resultaría en una dilación inconveniente e innecesaria. Pueblo v. Burgos Hernández, supra, a la pág. 839.
En el presente caso, el foro de instancia admitió en evidencia, el cuchillo, informe médico y diversas fotografías, incluyendo la del baño de la residencia, a saber los Exhibits IC, ID, y IE, en las que se reflejan dicho baño. El magistrado que presidió el proceso examinó las fotografías; usando su discreción concluyó que éstas eran suficientes para el propósito por el cual se ofrecieron en evidencia, es decir, reflejar el lugar de los hechos y denegó la inspección ocular solicitada. Entendió que el valor probatorio de la inspección ocular no añadiría nada significativo al proceso y de concederla resultaría en una dilación de los procedimientos, innecesaria presentación de prueba acumulativa, por razón de lo que se pretendía establecer con dicha inspección había sido ya objeto de testimonio, complementado con evidencia demostrativa, es decir, con las fotografías sometidas en evidencia. El juez de instancia no vio la necesidad ni la conveniencia de que se realizara una inspección ocular. No hay indicio de que éste abusara de su discreción, por lo que no se cometió el error.
*1202 Pasemos al último señalamiento de error, imponerle sentencias con agravantes, lo que constituye un castigo cruel e inusitado. Veamos.
Las penas impuestas están dentro de los límites fijados para el delito. Nada en los autos tiende a establecer que el Tribunal de Primera Instancia abusara de su discreción al imponer las sentencias. No constituye un castigo cruel e inusitado el sentenciar a un acusado a cumplir consecutivamente varias penas cuando la naturaleza de los delitos así lo justifica y las penas impuestas están dentro de los límites fijados por la Ley. Pueblo v. Pagán Santiago, _ D.P.R. _ (1992), 92 J.T.S. 56. Como norma general, el foro apelativo no debe intervenir con la discreción del Tribunal de Instancia en la imposición de la pena salvo en caso de abuso de discreción, Pueblo v. Echevarría Rodríguez, _ D.P.R. _ (1991), 91 J.T.S. 43; Pueblo v. Rivera Torres, 121 D.P.R. 128, 140 (1988). Nada en los autos nos permite apartarnos de esa norma, por lo que el error señalado no se cometió.
Por los fundamentos consignados las sentencias apeladas serán confirmadas.
Lo pronunció el Tribunal y lo certifica la señora Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General
ESCOLIOS 98 DTA 112
1. Páginas 28-32 de la "Certificación" de la Secretaria General del Tribunal de Primera Instancia de 9 de octubre de 1997, obrante en los autos originales del caso H HO-96-G0005.
2. Páginas 35-37 de la "Certificación" de la Secretaria General del Tribunal de Primera Instancia de 9 de octubre de 1997, obrante en los autos originales del caso H HO-96G0005
3. Páginas 46-50 de la "Certificación" de la Secretaria General del Tribunal de Primera Instancia de 9 de octubre de 1997, obrante en los autos originales del caso H HO-96-G0005.
4. Página 53 de la "Certificación" de la Secretaria General del Tribunal de Primera Instancia de 9 de octubre de 1997, obrante en los autos originales del caso H HO-96-G0005.
5. Páginas 1-2 de la E.N.P. (Enmendada) equivalente a las páginas 97-98, "Certificación" de la Secretaria General del Tribunal de Primera Instancia de 9 de octubre de 1997, obrante en los autos originales del caso H H0960004.
6. Página 3 de la E.N.P (Enmendada) equivalente a la página 99 de la "Certificación" de la Secretaria General del Tribunal de Primera Instancia de 9 de octubre de 1997, obrante en los autos originales del caso H H096G0004.
7. Página 4 de la E.N.P (Enmendada) equivalente a la página 100 de la "Certificación" de la Secretaria General del Tribunal de Primera Instancia de 9 de octubre de 1997, obrante en los autos originales del caso H H096G0004.
8. Páginas 4-8 de la E.N.P. (Enmendada) equivalente a las páginas 100-104 de la "Certificación" de la Secretaria General del Tribunal de Primera Instancia de 9 de octubre de 1997, obrante en los autos originales del caso H H096G0004.
9. Posteriormente fue declarada no ha lugar.
10. Páginas 8-11 E.N.P. (Enmendada) equivalente a la páginas 104-107 de la "Certificación" de la Secretaria General del Tribunal de Primera Instancia de 9 de octubre de 1997, obrante en los autos originales del caso H H096G0004.
*1203 11. Páginas 12-13 de la E.N.P. (Enmendada) equivalentes a las páginas 108-109 de la "Certificación" de la Secretaria General del Tribunal de Primera Instancia de 9 de octubre de 1997, obrante en los autos originales del caso H H096G0004.
12. Páginas 13-14 de la E.N.P. (Enmendada) equivalente a las páginas 109-110 de la "Certificación" de la Secretaria General del Tribunal de Primera Instancia de 9 de octubre de 1997, obrante en los autos originales del caso H H096G0004.