# 2007 DTA 117

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE ARECIBO**
**PANEL V - SUSTITUTO**

EL PUEBLO DE PUERTO RICO
Apelado

v.

JOSÉ M. DELGADO CARRIÓN
Apelante

Núm. KLAN-2006-00750

San Juan, Puerto Rico, a 5 de octubre de 2007

Panel integrado por su Presidente, el Juez Rivera Martínez,
y los Jueces Aponte Hernández y Morales Rodríguez

## TEXTO COMPLETO DE LA SENTENCIA

El 23 de mayo de 2005, José Delgado Carrión se encontraba en el patio de su casa hablando con René Rivera Santiago. Entonces le dijo a su amigo que tenían que buscar a *"Millito"* —Emilio Fuentes Centeno—, para darle *"una pela"* a *"Willy"* —William Román Ríos—, porque le había robado unas yeguas. Delgado Carrión le dijo, además, a Rivera Santiago que si Willy no decía dónde estaban las yeguas le iban a *"dar pa' abajo."* Una vez terminada la conversación, se montaron en el carro de Rivera Santiago —un Sunbird negro—, para dirigirse a casa de Millito. Antes de salir, Delgado Carrión buscó un bate de aluminio y una soga color naranja que usaba para amarrar la jaula de los caballos y los guardó en el Sunbird.

Ya en casa de Millito, Delgado Carrión le propuso a éste lo mismo que le había propuesto a Rivera Santiago. Le dio instrucciones para que, si Willy no decía dónde estaban sus yeguas, que le diera *"pa' bajo"*. Millito se montó en el Sunbird negro con ellos. Los tres se dirigieron nuevamente hacia la casa de Delgado Carrión. Al llegar, Millito se bajó del Sunbird. Se fue por el monte hasta llegar a la carretera que conduce a casa de William Román Ríos. Allí se escondió detrás de un árbol. Esperó a que Willy Román bajara. Delgado Carrión y Rivera Santiago dieron la vuelta. Pasaron por casa de Willy para ver si él estaba allí. Al percatarse que no se encontraba en su casa, se estacionaron en la carretera Las Canelas. Abrieron el bonete del carro para simular que tenían problemas mecánicos. Entonces Willy Román pasó por el lugar en su guagua Suzuki. Rivera Santiago le hizo señas para que se detuviera. Le dijo que la batería se le había agotado; que si podía prestarle la suya. Willy se bajó. Abrió el bonete. Cuando se viró para sacar la batería, Millito salió del monte y le dio un puño en la nuca. Delgado Carrión salió del Sunbird. Le dio a Willy varios golpes en la cabeza con el bate de aluminio. Sacó la soga anaranjada y se la entregó a Millito para que amarrara a Willy. Millito sacó del bolsillo de Willy un dinero que éste tenía. Delgado Carrión y Millito montaron a Willy en el asiento trasero de la guagua Susuki.

Cuando Rivera Santiago se fue a montar en su Sunbird, ya Delgado Carrión estaba sentado en el asiento del conductor y le indicó a éste que guiara la guagua Suzuki. Cuando se van a ir del lugar, Delgado Carrión le dice a Rivera Santiago *"dale que yo te sigo"*. Al salir del lugar se percataron que venía un vehículo en dirección contraria. Dieron reversa y viraron frente a una casa. Se dirigieron hacia la Cuesta del Río. Pero Delgado Carrión, en algún momento, dejó de seguir tras la guagua Suzuki. Él no llegó hasta la Cuesta del Río.

En aquel vehículo que conducía en dirección contraria a la guagua Suzuki y al Sunbird, estaba Ángel Alexis Velásquez Serrano, primo de Willy, acompañado de Melvin Serrano García. Cuando le pasaron por el lado, Velásquez Serrano se percató de que Rivera Santiago iba conduciendo la guagua Suzuki de su primo Willy; que en el lado del pasajero estaba Millito; y que Willy estaba recostado en la parte de atrás. También se percató que el Sunbird lo iba conduciendo Delgado Carrión. Extrañado, Velásquez Serrano se dirigió a casa de Willy para ver si éste había llegado. Una vez allí le comunicó a la familia de Willy lo que había visto. Éstos, preocupados, llamaron a la Policía. Sometieron una querella.

El agente Juan González Santiago acudió a la casa de Willy para investigar la situación. Luego de que Velásquez Serrano conversara con la familia de Willy acudió nuevamente al lugar de donde vio salir la guagua Suzuki y el Sunbird. Se percató de que había un charco de sangre, una camisa ensangrentada y el pastizal acostado. Ante dicha situación, Velásquez Serrano fue a la casa de José Román, primo de Willy, para buscar el automóvil de éste. Luego llamó a José Román para contarle lo que estaba sucediendo. Éste le indicó que lo fuera a buscar a la vaquería donde estaba trabajando.

Velásquez Serrano acompañado de José Román fueron hasta la casa de Delgado Carrión. Delgado Carrión escuchó que lo llamaban. Cuando salió, le preguntaron por Willy. Él les contestó que no sabía. Estando Velásquez Serrano y José Román en la casa de Delgado Carrión, llegó el agente Juan González Santiago. Éste hizo preguntas mientras Velásquez Serrano miraba los alrededores. Vio que el Sunbird negro estaba estacionado frente a una casa abandonada que había en el mismo terreno de Delgado Carrión; que tenía la goma trasera del lado del chofer vacía; y que el bonete estaba caliente. Le mencionó al agente González Santiago quien se acercó al carro. Lo alumbró con una linterna. Observó que había un bate ensangrentado en la parte posterior. Inmediatamente después, Delgado Carrión fue arrestado.

Mientras tanto, Rivera Santiago y Millito llegaron a la Cuesta del Río. Millito bajó a Willy Román del vehículo. Lo llevó hasta *"las piedras"*. Rivera Santiago se quedó en el carro. A los pocos minutos escuchó un disparo. Millito se montó corriendo en la guagua. Le dijo que se fueran. Al montarse, Rivera Santiago se percató que Millito tenía un revolver negro, calibre treinta y ocho, cañón largo. Ambos se dirigieron hacia el área donde residía Rivera Santiago. Este último se quedó en el lugar dirigiéndose posteriormente a la casa.

Millito se fue en la Suzuki con el arma que portaba.

El agente Wilfredo González Álvarez recibió una llamada por radio. Se le instruyó que pasara por la parte posterior del negocio El Coquí porque tenían un vehículo ocupado en relación con un delito. Llegó al lugar y se percató de que el vehículo era un Sunbird color negro con el neumático trasero del lado del conductor vacío. Cuando inspeccionó el vehículo se percató de la existencia de un bate de aluminio con manchas de sangre. Luego se fue al cuartel. Allí recibió una llamada telefónica. Se le informó que en el sector Rodríguez Olmo había un carro quemándose; que se dirigiera al lugar. Se dirige al lugar con el agente González Santiago. Se percató que era la guagua Suzuki de William Román Ríos.

Entonces el agente González Santiago le informó que Delgado Carrión estaba involucrado en un caso de secuestro; que Ángel Alexis Velásquez Serrano había visto a Rivera Santiago conduciendo la guagua Suzuki; que Emilio Fuentes Centeno iba en el asiento del pasajero y Willy iba en la parte posterior; y que José Delgado Carrión conducía el Sunbird negro que le pertenecía a Rivera Santiago. El agente González Álvarez expresó que conocía a Rivera Santiago. Se dirigieron inmediatamente hacia su residencia. Al llegar lo arrestó informándole que había sido identificado como la persona que manejaba la guagua Suzuki que apareció quemada, procediendo entonces a realizar las advertencias de ley.

Ya en el cuartel, Rivera Santiago le manifestó al agente González Álvarez que estaba dispuesto a cooperar. El agente le pidió que le dijera dónde estaba Willy. Rivera Santiago indicó que estaba muerto. Le reveló el plan que habían elaborado él, Delgado Carrión y Millito para darle una pela a Willy. Posteriormente, llevó al agente al lugar donde se encontraba el cuerpo del occiso.

El Ministerio Público sometió varias denuncias por infracción al Artículo 5.04 de la Ley de Armas, 25 L.P. R.A. sec. 416, y a los Artículos 106 (asesinato en primer grado), 169 (secuestro), 198 (robo) y 199 (robo agravado) del Código Penal de Puerto Rico, 33 L.P.R.A. secs. 4734, 4797,4826 y 4827, contra José Delgado Carrión y Emilio Fuentes Centeno. Un Jurado, después de evaluar la prueba desfilada, emitió veredicto de culpabilidad contra José Delgado Carrión por los delitos de robo agravado, secuestro y asesinato en primer grado. Lo declararon no culpable de la infracción a la Ley de Armas, *supra*. Posteriormente, se celebró el acto de lectura de sentencia. La juez sentenció a Delgado Carrión a cumplir, de forma concurrente, una pena de 25 años por el delito de secuestro, 15 años por el robo y 99 años por el asesinato en primer grado.

Inconforme, Delgado Carrión acude ante nosotros. Le imputa al Tribunal de Primera Instancia haber errado: (1) al determinar que el Ministerio Público había probado, más allá de duda razonable, todos los elementos de los delitos de robo agravado, secuestro y asesinato en primer grado; (2) al permitir que se pasara prueba de referencia en presencia del Jurado; (3) al denegar la solicitud de la defensa de que se impartieran instrucciones al Jurado sobre el desistimiento y los delitos de asesinato y agresión agravada a pesar de que la prueba justificaba dichas instrucciones; (4) al interrumpir y limitar la impugnación del principal testigo de cargo cuando la defensa le preguntaba sobre las condiciones del acuerdo con la fiscalía; (5) al no requerirle al Ministerio Público que descubriera prueba exculpatoria relacionada con el acuerdo; (6) y al privarle de su derecho a un juicio justo e imparcial y al debido proceso de ley. Atenderemos los señalamientos en el orden que nos fueron planteados.

## I

Para que pueda obtenerse una convicción válida en derecho que derrote la presunción de inocencia, es indispensable que el Ministerio Público presente prueba con respecto a cada uno de los elementos del delito imputado. *Pueblo en el interés del menor F.S.C.,* 128 D.P.R. 931, 941 (1991). Esa evidencia tiene que ser suficiente en derecho para establecer no sólo los elementos, sino su relación con el acusado. La culpabilidad tiene que probarse más allá de duda razonable, con evidencia que sea satisfactoria. *Pueblo v. Ramos Álvarez,* 122 D.P.R. 287, 315-316 (1988). Es *"prueba que produzca certeza o convicción en una conciencia exenta de*

*preocupación o en ánimo no prevenido." Pueblo v. Rodríguez Román*, 128 D.P.R. 121, 131 (1991). La insatisfacción de la conciencia del juzgador con esa prueba es lo que se llama duda razonable. *Pueblo v. Toro Rosas,* 89 D.P.R. 169, 175 (1963). Una duda así puede dar lugar a que, en alzada, se revoque una convicción.

Plantea Delgado Carrión que el Ministerio Público no probó su culpabilidad más allá de duda razonable. Arguye que la evidencia presentada no es suficiente para establecer los elementos de los delitos de robo agravado, secuestro y asesinato en primer grado y su conexión con él. Surge de la transcripción del juicio en su fondo, que el Ministerio Público demostró que Delgado Carrión inició la cadena de eventos que culminó con la comisión de los delitos de robo agravado, secuestro y asesinato en primer grado. Citaremos extensamente la declaración del testigo principal de cargo que fue creída por un Jurado:

*"P ¿Qué tipo de vehículo usted tenía ese día veintitrés de mayo de dos mil cinco?*

*R Un Sunbird color negro.*

*P Ok. Una vez usted llega a casa de José Delgado en ese Sunbird negro, ¿qué usted hace allí? ¿Qué usted hace?*

*R Me baje del carro.*

*P Anjá y ¿a dónde fue?*

*R A hablar con José.*

*P ¿Dónde?*

*R A la casa de José.*

*P ¿Dentro o fuera de la casa?*

*R Allí en el patio de la casa.*

*PJ En el patio de la casa.*

*P Ok y ¿qué hablaron allí usted y José?*

*R Él me dijo que fuéramos a buscar a Millito*

*P Ok, que fueran a buscar a Millito, ¿le dijo para qué?*

*R Sí.*

*P ¿Para qué?*

*R Para darle una pela a Willy.*

*P Ok. Y le dijo él porqué le quería dar una pela a Willy.*

*R Sí.*

P    ¿Por qué?

R    Porque él entendía que Willy le había robado las tres yeguas.

P    ¿Qué le había robado qué...?

R    Willy le había robado las tres yeguas.

P    Ok. Eeehh... ¿qué específicamente le dijo José que quería hacerle a Willy?

R    Quería darle una pela y si no decía ¿dónde estaban las yeguas que le dieran pa' bajo?

P    **Y cuando él le dijo a usted darle pa' bajo ¿qué usted entendió por dar pa' bajo?**

R    **Que lo iba a matar.**

P    Ok. Una vez Willy le dice eso a usted... eee... José le dice eso a usted, ¿qué ustedes hacen? ¿Qué hace José?

R    Me dice a mí que fuéramos a buscar a Millito.

P    Ok y ¿qué entonces hacen ustedes?

R    Nos montamos en mi carro y fuimos dónde vivía Millito. (...)

P    Ok. Yo le pregunto, antes de montarse el carro ¿hicieron algo?

R    **Él buscó el bate y lo echó en mi carro.**

P    **¿Cómo era ese bate que él echó en el carro de usted?**

R    **De aluminio.**

P    **¿En qué parte del vehículo colocaron el bate, él colocó el bate?**

R    **Donde yo iba guiando.**

P    **¿Llevaba algo más José, si usted lo sabe?**

R    **Una soga color anaranjada.**

P    Y luego que... esa soga color anaranjada de, si usted sabe, cómo era?

R    Él la usaba para amarrar la jaula de los caballos.

P    Ok. Una vez José se monta en el vehículo con usted, ¿qué ustedes hacen, hacia dónde se dirigen?

R    Nos dirigimos hacia la casa de Millito.

P    Hacia la casa de Millito. Una vez ustedes llegan a la casa de Millito, qué sucede allí?

R    Pues...salió para afuera ha hablar con José y conmigo.

PJ    ¿Y de qué hablaron?

R    Que íbamos a darle una pela a Willy.

P    ¿Qué le dijo, si algo, José a Millito que usted escuchara?

PD    Juez, es demasiado sugestiva. No se han sentado las bases de esa pregunta todavía.

P    Están hablando todos allí, Juez.

PJ    ¿Qué dijeron allí, que usted recuerde? ¿Qué dijo uno y qué dijo el otro? ¿Qué usted oyó?

R    José le dijo que....

P    ¿A quién?

R    **A Millito que si no dijera dónde estaban las yeguas que le diera pa' bajo.**

PJ    ¿Qué si quién no decía dónde estaban las yeguas?

R    Willy.

P    Ok.

P    ¿Usted dice que José le dijo eso a Millito?

R    Sí.

PJ    Anjá y ¿porqué le dijo eso a Millito? ¿Por qué?

R    Porque Willy le había robado las yeguas.

PJ    No, no, eso se sabe por lo que él quiere darle una pela. **¿Por qué él cuando dice que le va a dar pa' bajo se dirige a Millito? ¿Por qué? ¿Por qué no le dijo a usted, dale pa' bajo tú? ¿Por qué dijo "dale pa' bajo sino no me dice dónde están las yeguas a Millito, porqué se lo dijo a Millito?**

R    **Porque Millito es el que lo iba a matar.**

PJ    **Millito era el que lo iba a matar. ¿Y cómo usted sabe eso?**

R    **Porque él fue a buscar a Millito pa' eso.**

PJ    Ahhh...pa que Millito lo matara. ¿Y cómo lo iba a matar, dígame? Si usted sabe, usted está allí, yo no.

P    Usted sabía en ese momento, ¿cuándo están hablando allí siii... cómo iban a matar a Millito?

R    No.

P   Ok. Lo que se había hablado en ese momento allí era de ¿qué específicamente?

R   De darle la pela a Willy.

P   De darle la pela, Ok. Entonces ¿qué hace Millito una vez ustedes dialogan allí?

R   Se monta en el carro con nosotros.

P   Ok y ¿hacia dónde ustedes tres se dirigen? Usted, José y Millito.

R   Hacia casa de José.

P   Y luego ¿hacia dónde?

PJ   Perece, perece. ¿Salieron hacia casa de José otra vez? ¿No habían salido de casa de José a casa de Millito?

R   Sí, volvimos pa' tras pa' dejar a Millito por detrás de la casa de José...

PJ   Ah! Para dejar a Millito por detrás de la casa de José.

R   Sí.

PJ   Bien, y ustedes dos ¿qué hicieron entonces?

R   Pues nos fuimos por el otro lado.

P   ¿Y porqué dejaron a Millito por detrás de la casa de José?

R   Porque se iba a dirigir por el monte a esperar a Willy cuando Willy bajara.

P   Ok y entonces ¿ustedes se dirigen hacia dónde, usted y José una vez dejan a Millito?

R   Hacia casa de Willy.

P   Ok y ¿qué hacen?

R   Dimos la vuelta y nos paramos en la carretera allí.

(...)

P   OK, ¿porqué usted abrió el bonete del vehículo?

PJ   ¿Cuál era la idea de abrir el bonete, señor?

R   Para cuando él viniera que viera el bonete abierto para que se parara.

PJ   Para que se parara, ¿por qué? ¿Para qué? ¿cuál era su intención?

R   Para que él se parara.

P   Ustedes estaban simulando algo, si es que estaban simulando algo. ¿Para qué fueron que abrieron el bonete, para que se parara por qué? Usted le pidió ayuda a Willy para algo?

R   Sí, yo le dije que me prestara la batería.

P   Ok, le dijo que le prestara la batería y ¿qué hizo Willy cuando usted le pidió la batería prestada?

R   Él venía a sacar la batería...

PJ   A sacar la batería ¿de dónde?

R   De la guagua de él.

P   Y ¿qué hizo para hacer eso de sacar la batería del carro de él? ¿Qué hizo?

R   Se apeó de la guagua.

PJ   Se apeó de la guagua de él y hacia dónde caminó.

R   Hacia al frente mío.

PJ   Hacia al frente suyo ¿Y que pasó entonces?

R   Me ayudó a sacar la batería y cuando él se viró a sacar la batería, ahí Millito sale...

PJ   ¿Quién sale?

R   Millito.

P   ¿De dónde sale Millito?

R   Del monte (...).

R   Él sale, como Willy está así de espalda, le da un puño aquí atrás y él se cae.

PJ   Anjá. Y ¿qué pasó luego?

R   Ahí sale José de mi carro y cuando él se cae, él coge un bate y le da.

PJ   ¿Por dónde le dio?

R   Por la cabeza.

PJ   ¿Cuántas veces le dio?

R   Dos o tres veces.

P   ¿Y qué pasó luego?

R   Vira pa' tras pa' donde mi carro y busca una soga de heno color anaranjada...

PJ  *Anjá.*

R  *…y se la da a Millito y Millito le amarra las manos.*

PJ  *Para que Millito le amarrara las manos y ¿qué pasó?*

R  **Pues entre los dos, ahí yo vi a Millito cuando le sacó los chavos del bolsillo.**

PJ  *Usted vio cuando ¿quién le sacó un dinero del bolsillo?*

R  *Millito.*

P  *Anjá y usted ¿qué hizo?*

R  **Me quedé así asustado.**

PJ  **Se quedó asustado. Usted fue parte de todo eso y usted lo que se quedó fue asustado, ah? ¿Qué más hizo usted?**

R  *Pues cuando subí corriendo que me fui a montar en mi carro, ahí José estaba y no me dejó salir.*

PJ  *¿Cómo es?*

P  *¿Dónde estaba José en ese momento?*

PD  *Señoría, que el Jurado no está escuchando.*

PJ  **Ok, mire ¿le dieron con el bate, sí o no? ¿Quién le dio con el bate?**

R  **José.**

PJ  *José y luego que pasa eso qué usted dice que se quedó así asustado, ¿qué usted hizo?*

R  **Pues ahí en ese momento voy para el carro mío para montarme…**

PJ  *Cuando usted dice voy para el carro mío, ¿a qué carro se refiere?*

R  *Al Sunbird.*

PJ  *Al Sunbird, ¿y qué pasó entonces?*

R  *Pues José no me dejó salir.*

P  *¿Y dónde estaba José, en ese Sunbird? ¿Dónde estaba él montado?*

R  *En la parte del conductor.*

P  *En el conductor y entonces ¿qué hace usted?*

R  **Pues me tuve que… porque él me dijo este… dale vete guía la Suzuki.**

P  Ok, ¿quién que te dijo que guiaras la Suzuki?

R  José.

P  Willy dónde, ¿en qué parte lo montaron?

R  En la parte de atrás.

P  En la parte de atrás ¿de dónde?

R  De la Suzuki.

P  ¿Quién lo montó allí?

R  José y Millito.

PJ  José y Millito, usted no hizo nada entonces. Usted era el conductor del carro.

R  Sí.

P  Ok y entonces una vez se monta en ese vehículo de, de la Suzuki de Willy ¿dónde está Millito? ¿Millito dónde se monta?

R  En el lado aquí.

PJ ¯¿En el lado de quién?

P  Usted estaba conduciendo, ¿y dónde está Millito?

R  Pues en el lado.

PJ  ¿En el lado de quién?

P  ¿De qué persona?

R  Al lado mío.

P  Al lado de usted. ¿Y entonces Willy dónde está?

R  En la parte de atrás.

P  En la parte de atrás. Ok, entonces ¿qué pasó? ¿Se percató usted de algo? ¿Qué pasó?

R  Ahí yo veo que viene una guagua blanca bajando.

P  Usted ve una guagua blanca bajando y entonces ¿qué hace? (...)

R  Di reversa. (...)

PJ  Viró y cogió ¿hacia dónde?

R  Hacia la salida.

PJ  Anjá, estaba en retroceso o ¿estaba dando para el frente usted?

R  Para el frente.

PJ  Anjá ¿y qué pasó?

R  Pues nos dirigimos a la cuesta del río. (...)

P  Mire René, ¿quién le dice a usted, si alguien, que se dirigiera a la cuesta del río?

R  Millito.

P  Millito. **Entonces, ¿usted dice que usted se montó en la Suzuki en el área del conductor?**

R  **Sí.**

P  **Y José, ¿dónde se montó?**

R  **En el Sunbird mío.**

P  **¿En el sunbird de usted? Ok. Eee... ¿qué si algo dijo José?**

R  **Dale que yo te sigo.**

P  Dale que yo te sigo. Ok, entonces ¿qué pasó? ¿Qué hicieron?

R  Pues nos dirigimos a la Cuesta del Río.

P  Ok.

R  Llegamos allá.

PJ  Llegamos son mucha gente, ¿quiénes llegaron?

P  ¿Quiénes llegaron allí?

R  Yo y Millito.

P  ¿Y qué pasó con José?

PJ  ¿Y qué pasó con Millito?

R  **José nunca llegó.**

P  **¿Y en qué momento usted se percató que José no estaba detrás de usted?**

R  **Cuando íbamos por Carrizales.**

P   ¿Cuándo iban...?

R   Por Carrizales.

P   Por Carrizales. OK, entonces una vez usted llega a la Cuesta del Río ¿en qué parte de la Cuesta del Río usted estuvo allí, que hizo? (...)

R   Millito lo baja...

P   ¿Millito bajó a quién?

R   A Willy.

P   ¿Cómo lo bajó?

R   Lo agarró así y él estaba como... yo lo vi cuando tenía...

P   ¿Cómo estaba Willy?

R   Como temblando. (...)

P   Entonces, ¿qué pasó si algo?

R   Él lo arrastra y lo tira hacia las piedras.

P   ¿Y usted dónde se queda?

R   Montado en la...en la guagua, montado allí.

P   Montado en la guagua y cómo y porqué usted sabe que él...a dónde él lo tiró?

R   Él lo arrastra y lo tira, ahí yo escucho cuando le da los tiros.

P   ¿Usted escuchó que?

R   Cuando le da un tiro.

P   Ok ¿y que pasó entonces?

R   Sale corriendo se montó en mi...en la guagua y él dijo dale vámonos, vámonos, avanza.

P   Ok.

R   Y ahí yo me percato que...yo veo el revolver a él. (...)

P   Ok ¿y qué pasó entonces?

R   Ahí nos dirigimos hacia el lugar un poquito más debajo de donde yo vivo...

P   Ok.

*R Ahí yo me quedo, me fui para mi casa y ahí Millito se lleva la Suzuki y se lleva el arma también.*

*P Ok. ¿Cómo cuánto tiempo ustedes se tardaron, aproximadamente en tiempo desde donde le dan la pela a Willy hasta la cuesta del río?*

*R Como media hora.*

*P Como media hora. Usted dice que luego usted se va a su casa. ¿Qué pasó entonces una vez usted está en su casa, si algo?*

*R Pues que llegaron los guardias.*

*P Llegaron los guardias y ¿qué pasó?*

*R El policía González me dijo porqué estaba allí. (...)*

*P ¿Y le leyó las advertencias allí?*

*R Sí.*

*P Ok, una vez él le leyó las advertencias, ¿qué, si algo, usted le manifestó a él? ¿Qué usted le dijo al guardia? ¿Usted le narró los hechos al guardia, le dijo todo lo que usted está narrando en el Tribunal aquí?*

*PJ Pero bendito sea Dios, no me declare por él. Diga lo que usted le dijo al guardia, bendito sea Dios señor. ¿De qué usted habló con el guardia, de baseball?*

*P ¿Qué fue lo que usted le dijo al policía?*

*R Que sí, que...*

*PJ ¿Que qué?*

*R Él me preguntó que ¿qué participación yo tuve? Y yo le conté todo."*

El Código Penal de Puerto Rico establece que serán responsables por la comisión de la conducta delictiva los autores y los cooperadores. Art. 42, 33 L.P.R.A., sec. 4670. El Art. 43, 33 L.P.R.A., sec. 4671, define que se consideran autores, en lo que aquí es pertinente: (1) los que toman parte directa en la comisión del delito; (2) los que inducen a otra persona a cometer el delito; y (3) los que cooperan con actos anteriores, simultáneos o posteriores a la comisión del delito, sin cuya participación no hubiera podido realizar el hecho delictivo.

El Art. 198 del Código, 33 L.P.R.A., sec. 4826, dispone que comete robo quien se apropie ilegalmente de bienes muebles pertenecientes a otra persona, sustrayéndolos de ésta en su inmediata presencia y contra su voluntad, por medio de violencia o intimidación. Los elementos para que se configure el delito de robo son: (1) apropiarse ilegalmente, (2) de bienes muebles pertenecientes a otra persona, (3) que se sustraigan en su inmediata presencia, (4) en contra de su voluntad, (5) mediando violencia o intimidación. La violencia a la que alude el Art. 198 significa acometimiento personal, o sea, un empleo de fuerza física. *Pueblo v. Lucret Quiñones,* 111 D.P.R. 716, 739 (1981). Para constituir violencia es suficiente cualquier uso de fuerza o agresión que tenga o pueda tener el efecto de lograr que una persona se desprenda de los bienes de su pertenencia o de los que tiene en su posesión. *Pueblo v. Batista Montañez,* 113 D.P.R. 307, 314 (1982). Por otra parte, el Art. 199, 33 L.P.R.A., sec. 4827, dispone que cuando el bien objeto del delito de robo es un vehículo de motor, la persona incurrirá en un delito

grave de segundo grado.

El Tribunal Supremo ha interpretado que la gravedad de este delito está en función no del derecho a la propiedad, sino en función del ataque a la integridad personal. Es requisito, pues, que exista intimidación o violencia para que se configure el delito; que la víctima sea expuesta a un grave riesgo o peligro de perder la vida o sufrir grave daño corporal. *Pueblo v. Lucret Quiñones, supra*, págs. 738-739. Es por la peligrosidad que representa dicho acto que los legisladores han incluido el robo bajo la figura del asesinato estatutario.

El Ministerio Público desfiló prueba sobre todos los elementos del delito de robo agravado. Rivera Santiago testificó que cuando William Román Ríos se bajó de su vehículo para ayudarlo, Delgado Carrión le propinó al occiso varios golpes en la cabeza con un bate de aluminio. Luego le dio instrucciones a Rivera Santiago para que se montara en el carro de William Román indicándole que él (Delgado Carrión) los seguiría en el Sunbird hasta el destino final. Claramente vemos que Delgado Carrión fue autor principal de estos hechos. Tomó parte directa en la comisión del delito. Consumó el delito de robo agravado. Se apropió ilegalmente de un vehículo de motor perteneciente a William Román Ríos; lo sustrajo en su inmediata presencia en contra de su voluntad mediando violencia. El Ministerio Público probó todos los elementos del delito de robo agravado más allá de duda razonable.

El Art. 169 del Código Penal, 33 L.P.R.A., sec. 4797, tipifica el delito de secuestro. Dispone que toda persona que mediante fuerza, violencia, intimidación, fraude o engaño, sustrae, o retiene y oculta, a otra persona privándola de su libertad, incurrirá en delito grave de tercer grado. Dispone, además, que cuando se sustrae a la víctima del lugar en que se encuentre y se mueve a otro lugar, la sustracción de la víctima debe ser por tiempo o distancia sustancial. En *Pueblo v. Echevarría Rodríguez I,* 128 D.P.R. 299, 367 (1991), el Tribunal Supremo distiguió con hechos, lo que son meros o breves movimientos de las víctimas de los que constituyen movimientos sustanciales:

*"Surge de la prueba admitida que el apelante López Watts junto al testigo Newman interceptaron al Sr. Luis Vigoreaux en el Expreso de Trujillo Alto, en jurisdicción de ese municipio, y lo trasladaron a un apartado sector de Cupey Alto conocido como Los Guanos. De un sector al otro median varias millas de distancia y **su recorrido en automóvil toma alrededor de quince (15) minutos a una velocidad promedio de treinta y cinco (35) a cuarenta (40) millas por hora. Consideramos que esos hechos no se ajustan a los criterios que antes expusimos relativos a la sustracción incidental. No se trata de un mero movimiento de un cuarto a otro dentro de una residencia o estructura, ni de breves sustracciones en el área donde se cometía el delito primario o en su periferia. Ni siquiera consistió en movimientos dentro del área o vecindario en que ocurrió la sustracción. Existen elementos suficientes para considerar que en este caso medió una distancia sustancial en cuanto a la sustracción de la cual fue objeto la víctima.** De manera que, independientemente de la intención o de los propósitos principales o primarios del apelante, al efectuarse la sustracción no puede catalogarse ésta como incidental o accidental. Por las características y circunstancias particulares que informan estos hechos, los mismos configuran un delito separado y distinto de cualquier otro"*. (Énfasis nuestro)

En el caso ante nuestra consideración, el testigo de cargo, Rivera Santiago, indicó que luego de que Delgado Carrión le propinó los golpes en la cabeza a William, éste buscó una soga. Entre él y Millito le amarraron las manos a William Román. Lo montaron en la guagua Suzuki y lo trasladaron hasta la Cuesta del Río. Señaló que desde el lugar de la emboscada hasta llegar a la Cuesta del Río se tardaron como treinta minutos. Como podemos ver, no se trató de un mero movimiento breve en el área donde se cometía el delito primario o en su periferia o de movimientos dentro del área o vecindario en que ocurrió la sustracción. En este caso medió una distancia sustancial. Se configuró el delito de secuestro. Delgado Carrión participó en el proceso del movimiento de William Román mediante el uso de fuerza y violencia, por tiempo y distancia sustancial. El Ministerio Público probó todos los elementos del delito de secuestro más allá de duda razonable.

El Código Penal, en su Art. 105, define el asesinato como dar muerte a un ser humano con intención de causársela. 33 L.P.R.A., sec. 4733. El elemento central necesario para que se configure el asesinato es la intención. Ese elemento se deduce de los hechos, actos y circunstancias que rodean a la muerte. De la capacidad mental, motivación, manifestaciones y conducta de la persona se puede inferir racionalmente si hubo intención de matar. Por su parte, el Art. 23, 33 L.P.R.A., sec. 4651, establece que el delito se considera cometido con intención: (1) cuando el hecho ha sido realizado por una conducta dirigida voluntariamente a ejecutarlo; (2) cuando el hecho es una consecuencia natural de la conducta voluntaria del autor; y (3) cuando el sujeto ha querido su conducta a conciencia de que implicaba un riesgo considerable y no permitido de producir el hecho.

Nuestros legisladores clasificaron el delito de asesinato por grados según la forma, severidad o perversidad con que una persona lleva a cabo el acto delictivo. El Art. 106, 33 L.P.R.A., sec. 4734 define, en lo pertinente, que:

*"Constituye asesinato en primer grado:*

*(a) Todo asesinato perpetrado por medio de veneno, acecho o tortura, o con **premeditación**.*

*(b) Todo asesinato que se comete como **consecuencia natural de la consumación** o tentativa de algún delito de incendio agravado, agresión sexual, **robo**, escalamiento agravado, **secuestro**, secuestro de un menor, estrago, envenenamiento de aguas de uso público, agresión grave en su modalidad mutilante, fuga, maltrato intencional o abandono de un menor.(...)*

*Toda otra muerte intencional de un ser humano constituye asesinato en segundo grado."* (Énfasis nuestro)

Para que se configure un asesinato en primer grado, el Código establece, entre otros, dos supuestos: (1) la premeditación, que significa deliberación previa a llevar a cabo el hecho, luego de darle alguna consideración por un período de tiempo, Art. 14(w), 33 L.P.R.A. § 4642(bb), y (2) el asesinato estatutario que es el que se comete como consecuencia natural de la consumación o tentativa de robo o secuestro. En *Pueblo v. González Ramos,* resuelto el 16 de septiembre de 2005, **2005 JTS 131**, 165 D.P.R. ___ (2005), el Tribunal Supremo aclaró que el nuevo Código Penal mantiene tipificado el asesinato estatutario; sólo introdujo un cambio en la terminología. La figura es de total aplicación al caso ante nosotros.

En este contexto nuestra doctrina jurisprudencial adopta la teoría de la causa próxima. *Pueblo v. Rivera Torres,* 121 D.P.R. 128, 134 (1988), explica que la teoría asume que toda muerte causada al perpetrarse un delito grave es punible como asesinato en primer grado en su modalidad de asesinato estatutario. Basta que la comisión del delito sea la causa próxima de la muerte, independientemente de que no hubiese sido causada directamente por el acusado. Bajo esta teoría se asume que, al cometer el delito grave, el autor del delito puso en marcha una sucesión de eventos que previsiblemente pueden desembocar en la muerte ilegal. El autor del delito es responsable, pues, de todas las consecuencias naturales y probables de ese acto que inició. Esto no implica que toda muerte ocurrida durante la comisión de un delito grave sea imputable al autor del delito. Debe existir una relación de causa y efecto entre el acto delictivo y la muerte ocasionada. Basta que el acusado o los participantes en el delito, *"aun cuando se hayan abstenido de matar por mano propia, hayan puesto en marcha, al cometer uno de los delitos comprendidos en la ley, una sucesión de eventos que previsiblemente conduzcan a la muerte de un ser humano."* Pueblo v. Rivera Torres, supra, a la pág. 139.

En el caso ante nuestra consideración, el testigo de cargo, René Rivera Santiago, relató los hechos que culminaron con la muerte ilegal de William Román Ríos. De su testimonio surge que Delgado Carrión premeditó los hechos. Le dio instrucciones a Millito de *"darle pa' abajo"* a Willy desde el comienzo de este drama. Al así actuar, se convirtió en autor del delito de asesinato. Delgado Carrión fue, además, quien puso en marcha una sucesión de eventos que condujo a la muerte de William Román. Al perpetrar el delito de robo agravado y

secuestro se puso en marcha una sucesión de eventos donde era previsible la muerte de Román.

De otra parte, aunque Delgado Carrión no fue la persona que le disparó al occiso, los golpes por él propinados con el bate de aluminio fueron también causantes de la muerte. Según el testimonio de la patóloga, Edda Luz Rodríguez Morales, la muerte de Román fue producto de las laceraciones, contusiones y abrasiones encontradas en la cabeza y en el cuerpo del occiso combinadas con los dos impactos de bala. El Ministerio Público probó así todos los elementos del delito de asesinato en primer grado más allá de duda razonable.

## II

Delgado Carrión alega que su convicción descansó sobre prueba de referencia. Se refiere a la declaración del agente Juan González Santiago quien relató cómo el padre de Delgado Carrión le había dicho que su hijo había llegado en el Sunbird negro que se encontró al lado de la casa. *"[P]rueba de referencia [es una] declaración aparte de la que hace el declarante al testificar en el juicio o vista, que se ofrece en evidencia para probar la verdad de lo aseverado"*. Regla 60(c) de las de Evidencia, 32 L.P.R.A. Ap. IV, R. 60. Como regla general, la prueba de referencia es inadmisible en los procesos judiciales. Regla 61 de las de Evidencia, 32 L.P.R.A. Ap. IV. Sin embargo, existen múltiples excepciones que permiten la admisión de este tipo de evidencia. Las Reglas 62 a la 65 de las de Evidencia, 32 L.P.R.A. Ap. IV, R. 62-65, establecen las circunstancias bajo las cuales se puede admitir. Si no se demuestra ninguna de las excepciones, el foro de instancia debe descartar la evidencia. Pero si la toma en consideración, esto no supone revocación automática de la sentencia. Para que proceda la revocación, la parte perjudicada tendrá que demostrar: (1) que objetó oportunamente y bajo el fundamento correcto la prueba sometida; y (2) que tal admisión constituyó un factor decisivo o sustancial en la sentencia cuya revocación se solicita. Regla 4 de las de Evidencia, 32 L.P.R.A. Ap. IV, R. 4.

Mientras vertía su testimonio, el agente Juan González declaró lo siguiente:

*"TESTIGO: Y entonces una vez veo el bate así, pues voy donde el señor que llegó, que salió a relucir que era el papá de Pa' y le pregunto que quién llegó en el vehículo. Y éste me dice, "pues el nene mío". ¿Pero y el carro es de él? No es prestado pero..."* (...)

*DEFENSA: Juez tenemos objeción. Permiso para acercarnos.*

*FISCAL: Mire, anjá continúe.*

*TESTIGO: Ok, entonces le pregunto si él se encuentra, si Pa' se encuentra y este me dice que está en la parte posterior y en eso Pa' viene saliendo sin camisa. Viene saliendo y yo le digo este lo saludo, buenas noches Pa' este tú vienes en ese vehículo. (Énfasis Nuestro).*

No cabe duda que las declaraciones citadas como prueba de un hecho, no son del agente Juan González Santiago, sino del padre de Delgado Carrión. Constituyen claramente prueba de referencia que no era admisible bajo ninguna de las excepciones establecidas por el ordenamiento. El abogado del apelante objetó oportunamente la admisibilidad de estas declaraciones. Pero no indicó el fundamento en derecho. El Tribunal nada dispuso. El fiscal continuó haciendo su interrogatorio directo. El abogado debió insistir y fundamentar su objeción, según lo requiere la Regla 4.

Delgado Carrión señala que la admisión de esa prueba fue sumamente perjudicial para él. Arguye que esas declaraciones lo vinculaban directamente con los hechos. Sin embargo, la evidencia aquí impugnada no fue la única prueba que el Jurado tomó en consideración para llegar a la conclusión de que él conducía el Sunbird negro. El testigo principal de cargo, René Rivera Santiago, declaró al respecto. De una parte, la objeción no fue realizada conforme a derecho y, de la otra, la prueba de referencia no fue un factor decisivo o sustancial en la sentencia cuya revocación se solicita.

## III

La defensa de Delgado Carrión pidió que se impartieran instrucciones al Jurado sobre desistimiento, asesinato y agresión agravada. En todo proceso que se lleve a cabo ante Jurado, el tribunal deberá impartir instrucciones haciendo un resumen de la evidencia y exponiendo todas las cuestiones de derecho que sean necesarias para la información del Jurado. Regla 137 de Procedimiento Criminal, 34 L.P.R.A., Ap. II, R. 137. Las instrucciones se conforman según los hechos particulares del caso y las defensas que se presenten. *Pueblo v. Acevedo Estrada*, 150 D.P.R. 84, 95 (2000).

Las instrucciones deben extenderese, si la prueba lo justifica: (1) a los elementos de delitos inferiores al delito imputado o comprendido dentro de éste, (2) a los elementos esenciales de las defensas esgrimidas por el acusado, y (3) a los puntos de derecho que bajo cualquier teoría razonable puedan estar presentes en las deliberaciones, *"aunque la prueba de defensa sea débil, inconsistente o de dudosa credibilidad"*. *Pueblo v. González Colón*, 110 D.P.R. 812, 815 (1981).

En *Pueblo v. Rosario Orangel,* resuelto el 5 de noviembre de 2003, **2003 JTS 167**, 160 D.P.R. ___ (2003), el Tribunal Supremo pautó:

*"[U]na instrucción sobre delitos inferiores no le será transmitida al Jurado de forma automática, sino que es necesario que exista evidencia de la cual el Jurado pueda razonablemente inferir que el acusado es culpable del delito inferior. El problema es determinar qué implica el que "la prueba justifica las instrucciones". Sobre este particular se ha expresado que: Esto sólo puede significar que haya evidencia admitida, que de ser creída por el Jurado, sería suficiente como cuestión de derecho penal sustantivo, para que el acusado prevalezca."*

El Tribunal pautó allí que si la evidencia resulta insuficiente en derecho para establecer la comisión del delito inferior, el magistrado a cargo puede denegar una instrucción. En *Pueblo v. Negrón Ayala,* res. el 1 de junio de 2007, **2007 JTS 109**, 171 D.P.R. ___ (2007), el Tribunal Supremo reiteró su norma: *"hemos sido enfáticos en que el tribunal sentenciador no debe transmitir instrucciones de homicidio si los autos carecen de evidencia que justifique tal veredicto. (Citas omitidas) Fomentar dicha práctica equivaldría a autorizar al Jurado a que imponga un castigo diferente al prescrito para el delito que de hecho se cometió."*

La revocación de una convicción procede cuando el error al omitir o al impartir la instrucción en controversia es de tal naturaleza que de no haberse cometido, probablemente el resultado del juicio hubiera sido distinto; o cuando se violan los derechos sustanciales del acusado. *Pueblo v. Acevedo Estrada, supra,* pág. 96. Para ello es necesario que se haga el correspondiente planteamiento ante el foro apelado. *Pueblo v. Sánchez Torres,* 102 D.P. R. 499, 504 (1974).

En el caso ante nuestra consideración, la representación legal de Delgado Carrión presentó ante el Tribunal de Primera Instancia una *"Moción Solicitando Varias Instrucciones Adicionales e Instrucciones Especiales al Jurado"*. En lo pertinente, alegó que era necesario impartir instrucciones acerca del desistimiento y los delitos de asesinato y agresión grave de cuarto grado. Arguye, en su apelación, que la prueba desfilada demostró que el acusado desistió de la comisión del delito de asesinato en primer grado.

El Artículo 37 del Código Penal de Puerto Rico, 33 L.P.R.A., sec. 4665, indica que *"[s]i la persona desiste voluntariamente de la consumación del delito o, si luego de haber comenzado la ejecución del mismo, evita sus resultados no estará sujeta a pena excepto por la conducta previamente ejecutada que constituya delito por sí misma."* En *Pueblo v. Tribunal Superior,* 103 D.P.R. 755, 758 (1975), el Tribunal Supremo estableció circunstancias que han de considerarse para determinar si hubo desistimiento por parte del coautor del delito:

*"Para que el abandono de una acción criminal concertada pueda levantarse como defensa por los hechos ocurridos con posterioridad al retiro, tienen que concurrir ciertas circunstancias. Es indispensable la existencia*

*de un intervalo de tiempo razonable entre el abandono de la actividad criminal y el acto delictivo por el cual se imputa responsabilidad. El lapso de tiempo tiene que ser suficiente para que los otros participantes tengan la oportunidad de seguir el ejemplo del que se retiró y refrenar su actuación criminal concertada. **La comisión del delito debe ser imputable a una causa independiente.***" (Énfasis nuestro)

Más adelante, en *Pueblo v. Suárez Fernández,* 116 D.P.R. 842, 854 (1986), el Tribunal Supremo se enfrentó nuevamente al asunto y pautó: *"cuando un delito ha entrado en la fase de su ejecución, como es el caso ante nos, no basta para exonerar a uno de los coautores, que éste desista voluntariamente, **sino que debe realizar actos dirigidos a evitar el resultado delictivo"**.* (Énfasis nuestro)

No hay prueba en el expediente ante nosotros que evidencie desistimiento según las circunstancias requeridas por la jurisprudencia. Delgado Carrión dejó de seguir a sus compañeros en cierto momento. Pero no realizó ninguna gestión o acto dirigido a evitar la muerte de William. Tampoco desfiló prueba de que el asesinato cometido fuera *"imputable a una causa independiente"* de su propia instrucción desde el origen de la cadena de eventos iniciada por Delgado Carrión: que le dieran *"pa' bajo".* La presencia o ausencia de Delgado Carrión en el lugar donde ultimaron a William Román nada añadía o restaba a lo previamente planificado. En este caso, como vimos, se probó además que los golpes propinados por Delgado Carrión constituyeron uno de los factores que produjo la muerte ilegal. No erró el Tribunal de Primera Instancia al no impartir la instrucción al Jurado en cuanto al desistimiento.

Delgado Carrión alega que erró el tribunal de instancia al no impartir una instrucción sobre la definición de asesinato según el Artículo 105 del Código Penal, *supra.* El Tribunal no usó la definición de asesinato al dar sus instrucciones porque entró de lleno a los grados del delito que sanciona la ley. Pero explicó los elementos del asesinato, a saber: dar muerte de un ser humano —en este caso de William Román—, con la intención de causársela. La jueza de instancia definió intención, según el articulado del Código. Dio instrucciones sobre los grados del delito, los mayores y menores. Después de hacerlo concluyó: *"en este caso se le imputa a los acusados haber causado la muerte del ser humano William Román Ríos, como consecuencia natural de consumar el delito de robo y secuestro".* Procedió luego a explicar los elementos del asesinato estatutario. El no usar la definición de asesinato, en modo alguno viola derechos fundamentales o sustanciales de Delgado Carrión.

El señalamiento de error sobre la falta de instrucción en torno al delito de agresión agravada de cuarto grado resulta también inmeritorio. Como indicamos anteriormente, un tribunal está obligado a impartir una instrucción de un delito inferior al imputado *"cuando de la prueba presentada surge evidencia de la cual el Jurado pueda razonablemente inferir que el acusado es culpable del delito inferior".* El delito de agresión se configura cuando una persona, de forma ilegal por cualquier medio o forma, causa a otra una lesión a su integridad corporal. Art. 121, 33 L.P.R.A. § 4749. La agresión se considera grave de cuarto grado cuando la agresión ocasiona una lesión que no deja daño permanente, pero requiere atención médica, ayuda profesional especializada o tratamiento ambulatorio. Art. 122, 33 L.P.R.A. § 4750. La jurisprudencia ha señalado que en el delito de agresión se necesita una intención de causar daño, mientras que en el asesinato se necesita que la persona tenga intención de matar. *Pueblo v. Bonilla Ortiz,* 123 D.P.R. 434, 441 (1989).

Examinada la transcripción del juicio en su fondo, se desprende que ni el Ministerio Público ni la defensa pasó prueba sobre los elementos del delito de agresión agravada de cuarto grado. No se evidenció que los golpes propinados por Delgado Carrión produjeran una lesión que, aunque requiriera atención médica, no produjo daño permanente. La prueba presentada por el Ministerio Público demostró que los golpes propinados por Delgado Carrión no sólo produjeron un grave daño, sino que contribuyeron a la muerte de William Román. Además, la intención de Delgado Carrión, desde el origen, era la de asesinar, aunque fuera en la alternativa. Dicha intención se desprende de la conversación que éste sostuvo con Rivera Santiago y con Millito, donde claramente verbalizó que, si no decía dónde estaban las yeguas, le dieran *"pa' abajo".* La prueba presentada no justificaba una instrucción de agresión agravada de cuarto grado. El récord estaba huérfano de los elementos que configuran

dicho delito. Concluimos que no erró el Tribunal de Primera Instancia al no impartir instrucción del delito de agresión agravada.

Dicho lo anterior, hay que señalar que la Regla 137 de Procedimiento Criminal, *supra*, indica en lo pertinente:

*"[N]inguna de las partes podrá señalar como error cualquier porción de las instrucciones u omisión en las mismas **a menos que planteare su objeción a ellas o solicitare instrucciones adicionales antes de retirarse el Jurado a deliberar**, exponiendo claramente los motivos de su impugnación, o de su solicitud. Se le proveerá oportunidad para formular éstas fuera de la presencia del Jurado. El Tribunal procederá entonces a resolver la cuestión, haciendo constar su resolución en el expediente o transmitiendo cualquier instrucción adicional que estimare pertinente."* (Énfasis nuestro)

La defensa de Delgado Carrión sometió oportunamente y por escrito su solicitud de instrucciones adicionales y especiales a la jueza. Pero surge del expediente que, cuando la jueza terminó de impartir las instrucciones, la defensa, a preguntas de la magistrada, contestó que no tenían objeción a las instrucciones proporcionadas. Luego, cuando el tribunal inquirió si las partes tenían alguna petición o solicitud de instrucciones adicionales, el único señalamiento expresado por la defensa fue: *"las sometidas ante el tribunal que fueron unas admitidas y otras no"*, pero no solicitó instrucciones adicionales ni argumentó al respecto. Bajo estas condiciones, Delgado Carrión no puede alegar en alzada lo que le correspondía someter al foro apelado, antes de que el Jurado se retirara a deliberar.

## IV

Delgado Carrión señala que erró el Tribunal de Primera Instancia al no permitirle impugnar el testimonio del principal testigo de cargo con preguntas sobre las condiciones del acuerdo negociado con la fiscalía. La Regla 43 (c) de Evidencia, 32 L.P.R.A. § Ap. IV, R. 43, indica que *"el juez que preside un juicio o vista tendrá control y amplia discreción sobre el modo en que la evidencia es presentada y los testigos son interrogados con miras a que la evidencia sea presentada en la forma más efectiva posible para el esclarecimiento de la verdad, velando por la mayor rapidez de los procedimientos y evitando dilaciones innecesarias"*. La jueza que presidía la sala en este caso tenía autoridad para limitar el contrainterrogatorio cuando entendiese que pudiese confundir al Jurado.

Surge de la transcripción ante nosotros, que la representación legal de Delgado Carrión cuestionó ampliamente a Rivera Santiago en relación al acuerdo de inmunidad en presencia del Jurado. Veamos:

*"DEFENSA: Entonces al día de hoy todavía no ha hecho alegación de culpabilidad, verdad que no?*

*TESTIGO: No.*

*DEFENSA: No. Y parte del acuerdo de inmunidad es que depende de lo que usted testifique ahí, se le va a conceder o no? Verdad que sí'*

*JUEZ: Conteste.*

*DEFENSA: Sí o no?*

*TESTIGO: Sí.*

*DEFENSA: Si usted cambia las cosas no se lo dan, verdad que sí?*

*TESTIGO: Sí.*

*DEFENSA: De manera que usted tiene un interés en salir beneficiado aquí también, verdad que sí?*

*JUEZ: Conteste.*

*DEFENSA: Verdad que usted se beneficia.*

*JUEZ: Conteste joven.*

*TESTIGO: Cómo beneficio...*

*DEFENSA: Le explicó la fiscal en un momento dado que usted tenía que cumplir noventa y nueve años más el veinte por ciento que eso podía ser el equivalente a ciento veintinueve años de cárcel, le explicó eso?*

*TESTIGO: Sí.*

*DEFENSA: Y entonces ahora en vez de cumplir casi ciento treinta años, va a cumplir treinta años, verdad que sí?*

*TESTIGO: Sí.*

**DEFENSA: ...y en estas semanas, tan reciente como una o dos semanas atrás su abogado y el Ministerio Público llegaron a un acuerdo para ver si el Secretario de Justicia le puede dar hasta una probatoria, verdad que sí? Eso está en veremos...**

*TESTIGO: No eso yo no...*

*DEFENSA: No se acuerda, que su licenciado Trinidad discutió eso con la compañera fiscal para ver si le daban una probatoria? Usted está bajo juramento testigo.*

*FISCAL: No estaba presente él.*

*DEFENSA: Pero eso, eso pasó verdad?*

*FISCAL: Juez, si me permite Juez.*

*JUEZ: La pregunta es si ese asunto de la probatoria es parte de ese acuerdo?*

*FISCAL: No es parte de ese acuerdo.*

*JUEZ: Pues entonces...*

*FISCAL: De ese que tiene el compañero, no.*

*JUEZ: Bueno, yo lo que puedo...*

*FISCAL: Ni de ese y no existe ninguno todavía.*

*JUEZ: Ningún acuerdo de probatoria existe.*

*DEFENSA: Pero es importante, es importante Juez...*

*FISCAL:* No, no. Permiso para acercarnos, Juez

*JUEZ:* No, dígame, dígame para el récord.

*FISCAL:* OK, para el récord. Juez, el único acuerdo que existe de inmunidad es el que tiene el compañero en la mano.

*JUEZ:* Unjú.

*FISCAL:* No existe todavía ningún otro acuerdo.

*JUEZ:* Existe algún acuerdo para darle probatoria o alguna gestión que se esté haciendo para darle probatoria a este caballero?

*FISCAL:* El abogado de él...

*JUEZ:* ...porque sea menor de veintiún años?

*FISCAL:* **El abogado de él hizo un acercamiento al Ministerio Público en ese sentido, pero nosotros le indicamos a él que él tenía que cumplir con su parte del contrato de inmunidad que está firmado y que eso entonces se solicitaría al Secretario de Justicia y de nosotros tener el visto bueno del Secretario de Justicia, entonces podríamos si se lo concedíamos o no.**

*JUEZ:* Aquí la única persona que concede probatorias o no se llama Juez, eso es lo primero que hay. Lo segundo que hay es que ningún menor de veintiún años mayor de dieciocho que entra dentro de un delito de asesinato con arma de fuego tiene derecho a probatoria, a libertad bajo palabra, a cualquier clase de bonificación habida y por haber y se duplica la pena al amparo del siete punto cero tres. Esa es la Ley en este caso, así es que eso es darle falsas esperanzas al caballero porque como cuestión de derecho, él no cualifica, Ok y como cuestión de hecho solamente cualificarían si cambiaran la Ley. Diga, próxima pregunta."

La jueza de instancia tenía autoridad para interrumpir el contrainterrogatorio, como lo hizo, con el fin de mantener el orden debido en su sala de cara a evitar confusión en el Jurado, de una parte, y evitar dilaciones en el juicio, de la otra. La limitación a la que alude el apelante es una sin trascendencia alguna, ya que el Jurado recibió lo que la defensa de Delgado Carrión quiso comunicarle con fin de minar la credibilidad del testigo de cargo.

## V

El Tribunal Supremo ha pautado que *"es responsabilidad del Estado —en su obligación de proveer un juicio justo bajo la cláusula de debido proceso de ley, y aun sin mediar solicitud de la defensa—, revelar cualquier evidencia exonerante en su poder o vicios de falsedad en su prueba que de permanecer ocultos e ignorados sofocarían la verdad en la sala de justicia."* Pueblo v. Arzuaga Rivera, resuelto el 4 de noviembre de 2003, **2003 JTS 165**, 160 D.P.R. \_\_\_\_\_ (2003). Se considera prueba exculpatoria *"toda aquélla que resulta favorable al acusado y que posee relevancia en cuanto a los aspectos de culpabilidad y castigo, irrespectivamente de la buena o mala fe exhibida por el Ministerio Fiscal."* Pueblo v. Echevarría Rodríguez I, supra, pág. 333. Pero para fines de apelación, habría que determinar *"que la prueba exculpatoria suprimida, con una razonable probabilidad, habría alterado el veredicto o el castigo impuesto de haber sido presentada al juzgador de los hechos."* Id.

Delgado Carrión alega que el Ministerio Público no descubrió evidencia exculpatoria. Hace referencia a la negociación sobre una posible transacción entre el Ministerio Público y René Rivera Santiago para otorgarle libertad bajo palabra a cambio de su testimonio. Observamos, de entrada, que la prueba alegadamente excluida no es exculpatoria; es decir, no tiene *"relevancia en cuanto a los aspectos de culpabilidad y castigo"* contra Delgado

461

Carrión. Prueba exculpatoria sería la que estableciera que el acusado Delgado Carrión estaba fuera del vecindario o del país al momento de la cadena de hechos; ésa hubiese demostrado su inocencia. Pero la negociación en proceso de un acuerdo, como prueba del motivo que pudiera tener el testigo de cargo para mentir, es prueba de impugnación de credibilidad.

Como hemos visto, la representación legal de Delgado Carrión contrainterrogó extensamente a Rivera Santiago sobre el acuerdo de inmunidad entre éste y el Ministerio Público. Incluso preguntó, en presencia del Jurado, sobre la posible transacción de probatoria. El Ministerio Fiscal admitió, también en presencia del Jurado, que existieron unas conversaciones, pero éstas no se habían concretizado. Es decir, en ese momento, no existía evidencia que tuviera que ser descubierta. La discusión frente al Jurado, de otra parte, sirvió de impugnación suficiente del testimonio vertido. Si hubiese habido un error—que no lo hubo—, éste no perjudicó al acusado.

Visto todo lo anterior, concluimos que a Delgado Carrión se le garantizó su derecho al debido proceso de ley y al juicio justo e imparcial.

## VI
En virtud de lo expuesto, confirmamos la sentencia apelada.

Lo acordó el Tribunal y lo certifica la Secretaria.

Lcda. María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones